Breitel, J.
Defendants were charged with the kidnapping of one Charles Brooks, aged 22, of nondescript occupation and an epileptic with a criminal and mental hospital record. They had really sought to kill him by injecting a lye solution into his circulatory system with a makeshift hypodermic needle. The tourniquet device, an ordinary belt, used to dilate his veins and make them visible, probably saved his life by preventing the spread of the toxic solution throughout his body. The attempt to kill was made in New Jersey and hence not prosecutable in this State. But as their efforts to kill their victim aborted, defendants sought to dispose of his life, and eventually his body, in New Jersey and then finally in this State. Here the frustrated would-be killers were caught by the New York City police, with their victim bound and confined in an automobile trunk, and with three revolvers in their *532 possession. Because of the meandering travels with their confined victim, they were charged with the kidnapping, as well as the illegal possession of the revolvers. The victim attributed the motive for this bizarre crime, among other things, to his having been a witness to a homicide committed by some of the defendants. During the trial Brooks was being held as a material witness in an otherwise unidentified New Jersey homicide case.
As the prosecutor noted in summation, there was limited proof of motive. But he did quote from the prosecutor’s abstract of Grand Jury testimony, offered in evidence by defendants and received, which stated: 1 ‘ Defendant Howard asked complainant [that is Brooks] how complainant was going to pay for the six and a half loads of narcotics which Howard had given the complainant in the beginning of June. The complainant was supposed to hold the narcotics for Howard. He claims to have thrown them down the sewer.”[1] On this basis and upon what was otherwise just barely revealed in the evidence, the prosecutor argued in trial summation that there were two reasons for the attempted murder, namely, that Brooks had been a witness to a murder and that he had deprived defendants of a quantity of heroin.
Defendants Miles and Howard were sentenced for 50 years to life on the kidnapping charge, and 10 to 14 years on the weapons charge. Defendant Hopkins was sentenced for 25 years to life on the kidnapping charge, and for 3 to 7 years on the weapons charge. Defendant Hall was sentenced for 20 years to life on the kidnapping charge, and for 2 to 4 years on the weapons charge. The sentences of each defendant were to be served concurrently.
Defendants contend that the verdict of kidnapping was contrary to the weight of the evidence. They contend also that defendants believed their victim to be dead, so that they could not be guilty of kidnapping; and that the alleged kidnapping was incidental to, and a culmination of an attempt to murder the victim or dispose of his body, and hence was not a true kidnapping. They urge error on the trial in that the prosecutor failed to give defendants copies of the prosecutor’s résumé *533 of the victim’s testimony before the Grand Jury, or alert the defense to the existence of a pretrial statement of the victim given to an agent of the Federal Bureau of Investigation. Defendants Miles and Howard also argue that it was reversible error to admit into evidence postindictment statements made by each of them to an agent of the Federal Bureau of Investigation while in custody and without the presence of their lawyers. On appeal, defendants do not raise directly or seriously any issues on the weapons charges.
Although there was error in one aspect of the trial, the effect overall was harmless, and the convictions should be affirmed.
All the events that follow occurred in the State of New Jersey until, according to the prosecution evidence, the persons involved are found in the City of New York. Under the statute, a kidnapping occurring elsewhere provides venue in this State, if the victim is carried here (old Penal Law, § 1250, subd. 3). Hence, no jurisdictional issue is tendered.
Charles “ Cherokee ” Brooks, the victim, a resident of Newark, New Jersey, a self-styled entertainer and writer of unpublished poetry, who was once convicted of a crime, testified that on July 15, 1966 the defendant Sandra Hall, 16 years old, invited him to her house in Newark to listen to records together, while she baby-sat. He met Sandra and her mother in front of a bar at 9:30 p.m. and the mother drove them to the house. Sandra unlocked the door and invited him in, saying that she would turn on the lights. As Brooks stepped inside he was hit on the head and fell to his knees. When the lights came on he saw the other three defendants standing over him with guns pointed, and was told they were going to kill him. The three began to kick and beat him, his head already bleeding from the earlier blow, and carried him into the bathroom where they tied him to the toilet. Defendant Howard said he was going to shoot Brooks but, when Sandra Hall warned of the noise, they decided to give him a “ hot shot.” They untied his arms while Howard went into the kitchen with another defendant and said ‘ ‘ Boil up some lye. ’ ’ They tightened a belt they had placed on his arm “so his veins can pop” and injected a fluid into his arm, causing a burning sensation. Miles said, ‘ ‘ He should be dead. May be that you didn’t let the lye boil enough.” They repeated the entire *534 operation, giving him a total of four or five injections. Finally, Brooks grew dizzy and passed out.
When Brooks awakened they had him in the hallway with his hands retied and were rolling him up in a blanket. Howard said, “ This is how they do dead people.” Part of the time, Brooks pretended to be “ dead. ’ ’ They began to carry him when one of the defendants said, “ Well, he is getting too heavy ”, and another said. “ Well, he is dead anyway; the heck with him; just throw him down the steps.” They promptly did so. The next thing Brooks remembered was an automobile trunk closing on him and the movement of the automobile. (The automobile was one borrowed from the grandfather of defendant Hall.) He recalled a stop at a gasoline station but made no outcry because he believed it useless. While the car was moving he heard one of the occupants “ say something about ‘Take him to the Jersey City Meadows and burn him in gasoline; this way they wouldn’t find his body.’ ” The car stopped, but he heard a voice say ‘ ‘ somebody was around, that he saw something, ‘ Let’s go ’ ”, and the car began moving again. At another point in the trip Brooks heard someone say “ Since you are scared, what we should have did was just shot him over there and dumped him in the river somewhere.” The next thing Brooks remembered was that the car stopped again and he heard another voice asking for a driver’s license and car registration. He heard someone (a policeman) say, “ One of them has got a gun. Get up against the wall.” Brooks started to yell and bang on the trunk. A police officer opened it and untied him. The belt-tourniquet was still on his arm, and it was removed only after he arrived at Knickerbocker Hospital.
On cross-examination Brooks admitted that he had first told the police that he had been confined by defendants for several days before the rescue. Later, he told the New Jersey police that he had been confined since July 12th. He evidently testified to the same effect before the New York Grand Jury in this case.
Two patrolmen testified that at 2:40 a.m. on July 16, 1966 they investigated a vehicle, a three-year-old Cadillac, occupied by the defendants and parked at a fire hydrant at St. Nicholas *535 Terrace and 131st Street, Manhattan.[2] One of the patrolmen saw Miles, who had left the car, place a revolver, later found to be loaded, at the curb. The defendants were searched, and a loaded .22 calibre revolver was taken from Hopkins, and still another loaded revolver was found under a seat in the vehicle. After finding the third revolver both policemen heard banging and cries of help from the vehicle. They found Brooks in the trunk, his hands and feet securely tied, a cut on his forehead and his face swollen. His first words were that they (defendants) all had guns, had tried to kill him, and had put lye in his arm. A belt was tied around the upper part of his left arm, and the skin was ‘1 coming off. ’ ’
The physician who treated Brooks at Knickerbocker Hospital saw “ a chemical burn over the skin on the arm and * * * along the vein * * * produced ” by a “ caustic agent.” It appeared to be one or two hours old, but could have been as old as twelve hours. Another physician, who examined Brooks three or four months later, testified that ulcers on his arm were caused by a chemical agent, that he had never seen any like them on narcotic addicts, and that they could not have been caused merely by an unsterile needle. He further testified that the ulcers could not have been caused by the surface application of a chemical to an open wound.
Mrs. Catherine Hall, Sandra’s mother, a reluctant witness, testified that she had picked up Brooks that evening in her car at 9.00 p.m. and, after driving him and her daughter, dropped them off near her home in Newark. She did not return to her home until 3:00 a.m. when no one involved in the case was there. (Mrs. Hall’s testimony is critically significant. It places Brooks in Newark with one or more of the defendants, and belies their pretrial and trial accounts of first meeting Brooks in New York City.)
Defendant Sandra Hall did not testify. Her grandfather had testified that it was she who had borrowed his automobile to take a sick friend to a hospital, the same automobile that was driven to New York City from Newark by defendants.
*536 Howard, Miles, and Hopkins testified in their own defense.[3] Their testimony in essence was that all four defendants had left about midnight of the time in question on a trip from Newark to New York City, and that Brooks had not accompanied them.
According to Howard, once in New York City, the other three defendants left the car for a period on various errands, during which time Brooks, appearing frightened, first approached Howard, and told him he had to hide, he was being chased, and wanted to get out of the city. Howard refused to let him sit in the car because it had been borrowed and Brooks was a mess, but finally agreed, at Brooks’ suggestion, to allow him to ride in the trunk. Brooks’ hands and feet were never tied. When the other three defendants returned he did not tell them of Brooks’ presence in the trunk. Howard further testified that the car was stopped at St. Nicholas Terrace because the driver, Miles, had thought he heard something drop, and had gotten out to take a look.
Miles and Hopkins testified substantially to the same effect, adding that they had not known of Brooks’ presence in the car until he was discovered there by the police. Hopkins admitted to possessing a pistol he purchased that night in a public bar. He never examined the pistol in the bar, before or after purchase, because there was a policeman there.
The defense also showed that Brooks had been at least twice in mental institutions for grand mal epilepsy, and had been inconsistent in material matters in his several statements to law enforcement officials and before the Grand Jury. A witness, James Cagle, a narcotic addict since 1958, one-time jail-mate of the male defendants in this case,, and presently serving time in the city penitentiary, testified that he had seen Brooks on the street in New York City about 1:00 or 2:00 a.m. of the morning on which the police found him in the trunk at 2:40 a.m.
Defendants, as earlier noted, argue that there could be no kidnapping since the defendants believed their victim to be *537 dead. Section 1250 of the old Penal Law (since repealed) provides in part:
‘ ‘ A person who wilfully: * * * 3. Abducts, entices, or by force or fraud unlawfully takes, or carries away another, at or from a place without the state, or procures, advises, aids or abets such an abduction, enticing, taking, or carrying away, and afterward sends, brings, has or keeps such person, or causes him to be kept or secreted within this state, Is guilty of kidnapping ”.[4]
Defendants urge that the crime of kidnapping requires the conscious act to restrain the victim against his will, so that the belief that the victim is dead is as much a defense as that the defendants did not realize that they were transporting a person at all. This is true. Indeed the jury was charged:
“ You will notice that one of the elements of the crime of kidnapping is that the acts must be done wilfully. The word ‘ wilful ’ refers to a state of mind. It means that to be guilty of this crime, a defendant must intend to confine or detain the victim against his will.
“ Now, intent is a subjective element, a mental operation. Intent is the secret and silent operation of the mind, and its only visible physical manifestation is an accomplishment of the thing decided upon. Upon the question of intent, you may infer that a person intends that which is the natural and necessary and probable consequence or consequences of the acts done by him; and unless the act has been done under circumstances to preclude the existence of such intent, you have a right to find from the results produced, an intention to effect it.”
and
“ Implicit in the crime of kidnapping is the element of confinement itself. By this is meant that the victim must be under restraint and be limited and restricted in his freedom of movement by the choice of his captors.”
*538 and
“ Concretely, in order to find a defendant guilty under the first count of the indictment, the People must establish beyond a reasonable doubt that the defendant wilfully, that is, with the conscious intention of doing so, and unlawfully, that is, without legal justification, forcibly took and carried away the person of Charles Brooks, without his consent and against his will, holding him in physical restraint and confinement and bringing him from the State of New Jersey into the State of New York, and here keeping him.”
The question is whether the jury could have so found. No doubt, Brooks’ testimony permits an inference that defendants believed Brooks to be dead and were attempting merely to dispose of his body. Had defendants requested, as they did not, that if defendants believed Brooks to be dead, there could be no kidnapping, a refusal to so charge would have been erroneous.
Brooks ’ testimony, however, allows of other and more realistic inferences. After all, the defendants were not concerned with clinical death in its material sense or in the nice problem posed in metaphysical analysis. To them, their victim was “dead” when they had done all to him that would produce death now or inevitably in the near future. That goal, by their view, they had reached. But this is a far cry from believing the victim dead so as to escape the consequences of the kidnapping statute. Thus, the discussion of how to treat “ dead people ” could well indicate that they considered him as good as dead, or that there was no reason, so late in their crime, to be concerned with handling him gently. It may also evidence that at this point defendants no longer cared whether Brooks was dead or alive. In any event, their absolute belief in Brooks’ death is belied by their retieing his hands sometime after he passed out in the bathroom and before they carried him down the stairs. On all the evidence, the jury could find that the defendants believed Brooks to be alive, or were not yet convinced that he was quite dead, and, therefore, had intended to kidnap him.
A second issue concerns the nature of the kidnapping as ancillary to the attempted murder. This court held in People v. *539 Levy (15 N Y 2d 159) that the crime of kidnapping is limited to “ the conventional sense in which that term has now come to have acquired meaning” (p. 165). Thus the brief asportation of a couple in their own car, during a period of 20 minutes and a drive of 27 city blocks, was held an integral part of the robbery committed, and not a separable kidnapping. To be sure, in People v. Lombardi (20 N Y 2d 266) this principle was applied to greater periods of time and greater distances, by holding that the several transportations of drugged girls from Manhattan to a motel in Queens were a part of the crimes of assault and attempted rape and not kidnapping.
The cases cited are inapplicable. Brooks testified to an extensive trip, first, presumably to the Jersey City Meadows and then to upper Manhattan. The more complicated nature of the asportation, with changes in purpose and direction, first to a place in New Jersey, and then to New York, for purposes connected with but not directly instrumental to the attempt to kill Brooks, removes this case from the exception of the Levy-Lombardi rule.
In the Levy and Lombardi cases, and especially in the Levy case, the restraint and asportation were parts of the crimes ultimately committed. The robbery and the rapes could not be committed in the forms planned without the limited asportations there involved. Indeed, in any robbery, there is a restraint of “ false imprisonment ” and in every rape there is a similar restraint and often removal in some limited sense. It is this kind of factual merger with the ultimate crime of the preliminary, preparatory, or concurrent action that the rule is designed to recognize, and thus prevent unnatural elevation of . the “true” crime to be charged. It is a merger suggestive of, but not quite like, the merger of the preparation and attempt with the consummated crime, a familiar concept in the criminal law.
Moreover, the rule has no purpose of ignoring as independent crimes alternative or optional means used in committing another crime which, by the gravity and even horrendousness of the means used, constitute and should constitute a separately cognizable offense. Nor was the Levy-Lombardi rule intended to exclude from “traditional” or “conventional” kidnapping abductions designed to effect extortions or accomplish murder. *540 Indeed, in the Levy case, concern was expressed only With respect to elevating ordinary robberies, rapes, and assaults into the much more serious crime of kidnapping by too literal an application of the wording of the kidnapping statute. Thus, it is quite significant that in the Levy case (supra, p. 164) kidnapping was recognized as often facilitating an extortion, the ultimate crime (and, therefore, connected with the ultimate crime) but still being cognizable as a separate offense. And by way of further distinction, it was also said, 1 ‘ There may well be situations in which actual kidnapping in this [conventional] sense can be established in conjunction with other crimes where there has been a confinement or restraint amounting to kidnapping to consummate the other crime ” (p. 165).
In short, the Levy-Lombardi rule was designed to prevent gross distortion of lesser crimes into a much more serious crime by excess of prosecutorial zeal. It was not designed to merge “ true ” kidnappings into other crimes merely because the kidnappings were used to accomplish ultimate crimes of lesser or equal or greater gravity. Moreover, it is the rare kidnapping that is an end in itself; almost invariably there is another ultimate crime.
Returning to this case, the People’s evidence showed that the defendants may have, and most probably, kidnapped Brooks so that he might be murdered elsewhere. Thus Brooks may have been “ taken for a ride ” both literally and figuratively. If such was the case, and the jury so found, as it did, the Levy-Lombardi rule would not apply, since kidnapping, in its traditional sense, covers abduction not only for purposes of extortion, but also murder. Under this approach, since the facts raised no issue involving the Levy-Lombardi rule, the crime of kidnapping was established, if the jury accepted the People’s proof.
For parallel reasons, it was not error for the trial court to refuse to charge as requested by counsel for one of the defendants that “ If you find that the restraint of Brooks, even if it were accompanied by asportation was an integral part and or incidental to the crime or crimes committed against Brooks, even though the defendants may not be charged with those other crimes, you must return a verdict of not guilty on the kidnapping count.” On no view of the People’s evidence, if *541 believed, and it had to be believed to find defendants guilty of any crime (other than the possession of the guns), would there be a rational basis for applying the Levy-Lombardi rule and find that the asportation was only an inseparable part of the attempted murder.
Defendants urge that reversible misconduct was committed when the prosecutor failed to surrender his own résumé of Brooks’ Grand Jury testimony, and failed to inform defendants that the victim-witness Brooks had made a pretrial statement to F.B.I. agent Matson.
Early in the trial, the prosecutor, on demand, gave the defense attorneys transcripts of Brooks’ testimony before the Grand Jury. Two defense attorneys inquired as to whether there were additional notes and were answered “.There are no notes. There are no statements taken from this witness. The only statement I have is the Grand Jury testimony.” It was later revealed at the trial that, apart from the transcript, a résumé of Brooks’ testimony before the Grand Jury was made by another member of the prosecutor’s staff. After an initial contention by defense counsel that the résumé was inconsistent with the Grand Jury testimony, a contention refuted by comparison of the documents, it was then argued that .the prosecutor’s denial of the summary’s existence was in itself a fraud. But the charge of fraud was hollow since the summary was that of a transcript which had already been made available to the defense. True, People v. Rosario (9 N Y 2d 286) held that all statements made by prosecution witnesses to police, District Attorney, or Grand Jury should, on demand, be turned over, in their entirety, to the defense for possible use in cross-examination. But the defense, having been provided with the complete transcript of Brooks’ testimony, was hardly entitled to the summary based on the same testimony made by the prosecutor’s office for its own internal records.
A second pretrial statement, given by Brooks to the F.B.I. agent on the day of his rescue, was also in existence and the prosecutor’s office was first given a copy of the agent’s summary two weeks before the trial began. The prosecutor was not given a copy of the full statement until the morning of the day when the agent was called by the defendants to testify. As the People concede, the defendants were entitled to examine this *542 statement before Brooks’ cross-examination. But the People’s failure to alert the defense to the statement’s existence, or to provide them with whatever records of the statement that were available, was harmless error. Defendants elicited all that was involved from the agent’s in-court testimony, albeit after the cross-examination of Brooks had been concluded. The defense, however, had they so chosen, could then have recalled Brooks and used his earlier statements against him.
A serious question is raised by the People’s use in rebuttal of statements made by Miles and Howard to the F.B.I. agent, after indictment and arraignment. Both defendants had been advised that they did not have to answer any questions, that what they said could be used against them, and that they could consult with a lawyer before answering any questions. Both defendants told the agent that they had attorneys, but said they were willing to answer questions without their attorneys being present. This court has recently held that “ [o]nce an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant’s right to counsel” (People v. Arthur, 22 N Y 2d 325, 329, citing People v. Vella, 21 N Y 2d 249). Thus it was improper for the agent to interview Miles and Howard without obtaining their consent in the presence of their attorneys, and statements thus obtained were inadmissible. The bar to admissibility is not obviated merely because these interviews occurred before the Arthur and Vella eases were decided, the rule being entitled to retroactive recognition, at least as to interrogations occurring since the decision in People v. Di Biasi (7 N Y 2d 544).
The People argue, however, that, although obtained improperly, the statements may, nevertheless, be used to impeach credibility, once defendants have taken the witness stand, citing People v. Kulis (18 N Y 2d 318). In the Kulis case, the court, relying on Walder v. United States (347 U. S. 62), held, Per Curiam, by a divided court, that testimony inadmissible as a part of the People’s direct case under the Escobedo (378 U. S. 478) and Donovan (13 N Y 2d 148) cases was nevertheless admissible to impeach defendant’s credibility. No objection was raised at the present trial or request made that the trial court so limit the jury’s consideration of these statements, *543 which, were used both in cross-examination of the defendants and rebuttal. In any event, since the only purpose in using the statements was to show them as inconsistent with the exculpatory trial testimony of those defendants, it would make no logical difference whether the use of the statements was limited to impeachment or received as evidence in chief. In either event, the harm of the statements was by their content confined to impeachment of the trial testimony.
But the problem with these statements persists. In the Walder case, on which, as noted, the Kulis case was based, the Supreme Court held that where the defendant, on direct examination, affirmatively resorts to perjurious testimony, the prosecution may challenge the defendant’s credibility by offering evidence which would be, otherwise, inadmissible on the Government’s case in chief. That court specifically excluded from this exception cases where the prosecution asked defendant questions not covered in his direct testimony, in order to lay a foundation for the tainted evidence on rebuttal (347 U. S., pp. 64-66).
In the present trial, on cross-examination, the People asked both Miles and Howard questions evoking many details not covered in their direct testimony but contained in their pretrial statements to the F.B.I. agent. Inconsistencies between the pretrial statements to the F.B.I. agent and the trial testimony, including those elicited on cross-examination, were thus developed.
Defendant Howard was questioned about details covered by the defendant in his statement to the F.B.I. agent concerning the period before he began his trip to New York City, although his direct testimony did not cover this time period. He was then asked if he had made contradictory statements to the agent and, after his denial, was rebutted by the agent’s testimony.
Critically important is that Howard on his direct testimony did not testify to any of the events in New Jersey except for the barest description of the start of the trip to New York. His real narrative starts with the arrival of the defendants in Harlem. On the other hand, Miles testified on direct examination, albeit cursorily, to the sequence of events, according to the versions of defendants, that occurred in Newark, before the start of the trip to New York City.
*544 Applying the Kulis-Walder rule, Miles’ pretrial statement to the F.B.I. agent was usable and admissible. Miles had ‘ ‘ opened the door ’ ’ by his testimony on direct examination. The same cannot be said of Howard. Hence, as to Howard, the pretrial statement was not usable and was not admissible, and its use and admission were errors.
But it is difficult to conclude that the errors were of sufficient consequence to merit a new trial as to defendant Howard. The inconsistencies established related only in part to the quasi-alibi preliminary events. Both the testimony and the pretrial statement were exculpatory. True, this does not make it a trivial matter, but the impropriety is confined to an incidental part of the case and on a trial in which the proof was overwhelming in establishing the guilt of defendants. Indeed, the very use and introduction of the pretrial statement was the result of the able prosecutor’s “ over-trying ” his case. The exculpatory testimony of the defendants who testified approached incredibility as a matter of law. The defense witnesses were patently unbelievable, and the testimony of the reluctant witness, Mrs. Hall, and that of the policemen who rescued Brooks, all but conclusively corroborated Brooks’ story in its main outlines, despite the inherent unreliability of a witness such as Brooks. For all these reasons the error should be treated as harmless (Code Crim. Pro. § 542; cf. Chapman v. California, 386 U. S. 18, 22-24).
Accordingly, the judgments should be affirmed in all respects.
Judges Burke, Scileppi, Bergan, Keating and Jasen concur; Chief Judge Fuld concurs in result only.
Judgments affirmed.

. It is of interest that the jury requested this portion of the exhibit to be read to them and they were permitted to take the exhibit into the jury room.

. The location is near a college campus and the prosecutor, on summation, argued that defendants probably intended to kill Brooks, and dispose of the body, in the enclosed park area, deserted at that •hour.

. Miles, aged 39, had an extensive criminal record since 1945. Howard, aged 30, had an extensive criminal record starting in 1956. Hopkins, aged 25, had some criminal convictions.

. The new Penal Law, effective September 1, 1967, provides an entirely new definition and classification of the crime of kidnapping (§ 135.00 et seq.).