105 N.J. Super. 514 (1969)
253 A.2d 481
THE STATE OF NEW JERSEY, PLAINTIFF,
v.
JAMES KRESS, ROBERT TROY AND JOHN JORDAN, DEFENDANTS.
Superior Court of New Jersey, Law Division  Criminal.
Decided May 9, 1969.
*515 Mr. Martin J. Queenan, Prosecutor for Burlington County, for State of New Jersey.
Messrs. Lord and Doyle, Attorneys for defendant James Kress (Mr. Joseph F. Doyle appearing).
*516 Messrs. Hartman, Schlesinger, Manual & Schlosser, attorneys for defendant Robert Troy (Mr. Jan M. Schlesinger, appearing).
Mr. Stanley C. Van Ness, Public Defender, attorney for defendant John Jordan (Mr. Harold C. White, Deputy Public Defender, appearing).
MARTINO, A.J.S.C.
Three defendants stand indicted for the crime of murder. The indictment is in the usual form and alleges that they jointly, on November 7, 1968 in the Township of Cinnaminson, did willfully, feloniously and of their malice aforethought kill and murder Douglas Tyler contrary to the provisions of N.J.S. 2A:113-1 and 2A: 113-2. They stand indicted in separate indictments of lesser offenses which include conspiracy to feloniously and forcibly take and steal from the persons of employees of the Garden State Bank (N.J.S. 2A:98-1); carrying certain firearms, to wit, pistols (N.J.S. 2A:151-41); stealing an automobile (N.J.S. 2A:139-1); and robbery (N.J.S. 2A:141-1 and 2A:151-5).
The present application is directed to the murder indictment. Defendants move to quash it and seek an Order fixing bail.
They rely on answers supplied by the State to a demand for a bill of particulars, and the transcript of the testimony taken at an in camera hearing for the fixing of bail in the case of defendant Robert Troy.
The facts which resulted in the murder indictment were these:
On November 7, 1968, while the bank was open to business, three men, who appeared suspicious to a vice-president, looking through an outside window, entered the bank. Unknown to them, he "hit" the alarm button. As they entered they drew revolvers and ordered him away from his desk. Two of the defendants leaped over a counter and herded the *517 tellers and officers into the back room. Meanwhile, police officer John Obuchowski was in the police station when the alarm sounded there. He proceeded to the bank, alone. Upon arriving there his attention was called to two armed men who were walking toward the front door. He took a position facing the front door and pointed his shotgun toward that door. He saw a man walk out the door carrying a bag and shouted "Halt!" the man turned and ran back into the bank. At this point a woman, apparently a customer, was approaching the bank and the officer waved her away. Then another policeman arrived and was told by Obuchowski to watch the drive-in window because from that spot he was an easy target for anyone within the bank. The front door opened again, a man in a white shirt came out, apparently saw the police officer and ran back although he had also been warned to halt. The front door opened again and a man was walking in bent over position in front of one of the defendants who had a drawn gun. Obuchowski shouted "Halt!" but the first man kept coming. The officer fired his weapon and struck the first man, but before he could shoot the armed defendant the latter returned to the inside of the bank. Obuchowski identified the armed defendant as Robert Troy. The person who was shot and fatally wounded was Douglas Tyler, a bank official. His wrists were handcuffed behind his back and a coat had been thrown over his shoulders. Statements of witnesses whose names were furnished defendants in the bill of particulars definitely and unequivocally indicated that one of the defendants ordered decedent to go with him, and this command was given shortly before they heard the shotgun blast. After the killing and the arrival of more police, defendants meekly surrendered.
Defendants contend that since the death of the bank official was caused by a policeman's bullet, a charge of murder against them has no basis in law. The State does not agree and argues that while our statutes on murder would mark this a first-degree case, even though the lethal weapon was fired by the police officer, another aspect of the case, namely, *518 defendants' use of decedent as a shield in attempting to escape, would justify a murder conviction.
Pennsylvania and California have had occasion in recent years to pass upon somewhat similar situations. Each has concluded that under its statutes covering murder it is necessary, in order to apply the felony murder doctrine, to show that the conduct causing death was in the furtherance of the design to commit a felony, and death must be a consequence of the felony and not merely coincidental. Commonwealth v. Redline, 391 Pa. 486, 137 A.2d 472 (Pa Sup. Ct. 1958). In People v. Washington, 62 Cal.2d 777, 44 Cal. Rptr. 442, 402 P.2d 130 (1965), the California Supreme Court held that for a defendant to be guilty of murder under the felony murder rule, the act of killing must be committed by defendant or his accomplice acting in furtherance of their common design.
Both of the cited cases arose out of a killing of a co-felon by a victim of the robbery. The present case involves the killing of an innocent person by a police officer who was called to the scene to apprehend the felons who were in the course of perpetrating a robbery.
While California has a statute defining first degree murder which is similar to ours, their definition of murder is dissimilar. California's murder statute, Penal Code, § 187, as it read when Washington, supra, was decided, stated:
"Murder is the unlawful killing of a human being, with malice aforethought."
Pennsylvania has no statutory definition of murder; murder is founded upon the common law and includes the felony-murder concept. United States ex rel. Almeida v. Rundle, 383 F.2d 421 (3 Cir. 1967).
The common law did not recognize degrees of murder. Murder in either of the statutory degrees in our State was murder at common law. State v. Brown, 22 N.J. 405 (1956). Where a statute has varied the whole subject of the common law in regards to a particular crime and has changed *519 the character of the offense or the nature or degree of punishment, the statute must be regarded as a virtual repeal of the common law because such must be presumed to have been the intention of the Legislature. But unless such intent is manifest, repeal by implication cannot be inferred. State v. Norton, 23 N.J.L. 33 (Sup. Ct. 1850); State v. Western Union, 12 N.J. 468 (1953).
New Jersey defines murder and degrees of murder. N.J.S. 2A:113-1 provides as follows:
"If any person in committing or attempting to commit * * * robbery, * * * or any unlawful act against the peace of this state, of which the probable consequences may be bloodshed, kills another, or if the death of anyone ensues from the committing or attempting to commit any such crime or act; or if any person kills a judge, magistrate, sheriff, coroner, constable or other officer of justice, either civil or criminal, of this state, or a marshal or other officer of justice, either civil or criminal, of the United States, in the execution of his office or duty, or kills any of his assistants, whether specially called to his aid or not, endeavoring to preserve the peace or apprehend a criminal, knowing the authority of such assistant, or kills a private person endeavoring to suppress an affray, or to apprehend a criminal, knowing the intention with which such private person interposes, then such person so killing is guilty of murder." (Emphasis added)
N.J.S. 2A:113-2 defines the degrees of murder:
"Murder which is * * * committed in perpetrating or attempting to perpetrate * * * robbery * * * is murder in the first degree."
New Jersey's definition of murder as distinguished from its definition of the degrees of murder is novel, as an examination of the various statutes throughout the nation will reveal. Many states have used the common law definition as a basis for the offense of felony-murder. See Morris, "The Felon's Responsibility for the Lethal Acts of Others," 105 U. of Pa. L. Rev. 50, 51 (1956).
The classifications of homicide at common law are (1) justifiable, (2) excusable and (3) felonious homicide. The first has no share of guilt at all, the second very little, *520 but the third is the highest crime against the law of nature that man is capable of committing. 4 Blackstone's Commentaries 178; Commonwealth v. Redline, supra.
The clause, "or if the death of anyone ensues from the committing or attempting to commit any such crime or act;" in N.J.S. 2A:113-1, requires interpretation. This clause is closed by a semicolon. Then follows another clause which relates to a different subject and which ends with the phrase, "such person so killing" is guilty of murder. If the expression, "such person so killing," is to be related to the clause in question, then a construction of the statute would require the course taken by Redline and Washington in that the factual situation, which is conceded, would not be classified as murder as far as these defendants are concerned since the fatal shots were not fired by any one of them.
Ordinarily the word "or" in a statute is to be considered a disjunctive particle indicating an alternative. Murphy v. Zink, 136 N.J.L. 235 (Sup. Ct. 1947), affirmed 136 N.J.L. 635 (E. & A. 1948).
"The purpose of judicial interpretation is the discovery of `the true sense of the form of words which are used * * * taking all its parts into consideration, and, if fairly possible, giving them all effect.'" State v. Murzda, 116 N.J.L. 219 (E. & A. 1936).
Nearly all cases emphasize the controlling factor of legislative intent, not only as to the meaning of particular words and phrases but also the general spirit of the act in question.
The history of the legislation is also an important aid. By history, the courts mean the prior statutes on the same subject. Murphy v. Zink, supra; Lloyd v. Vermeulen, 22 N.J. 200 (1956).
The expression, "or if the death of anyone shall ensue from the committing or attempting to commit any such crime or act," was a part of the murder definition early in New Jersey legal history. "An Act for the Punishment of Crimes," § LXVI, Patterson, Laws of New Jersey 208, at p. 220 (1800).
*521 In 1829 the murder statute was reenacted; again the expression was repeated and it has been carried to the present day. L. 1829, § 66, p. 240; N.J.S. 2A:113-1. This same language has appeared in all the supplements and amendments to the murder statute, from the earliest times.
What was the intention of the Legislature in including this clause when its absence would clearly indicate that murder could only be charged against the felon who actually fired the bullet that killed an innocent victim? If the clause is surplusage and has no separate meaning, why has it been carried through all the early legislative history of the statute? Would not the expression be redundant when taken into consideration with all the provisions of the statute were it not intended to mean what it appears to say?
The State also predicates its right to charge defendants with murder on another ground. The facts as stipulated for the purpose of this motion indicate an inference that the decedent was being used as a "shield" when he was fatally shot. A shield is a felon's use of an innocent person by force as a potential protection against retaliation.
There are so-called "shield cases" which have been decided in other states. The case which comes close to the instant one is Wilson v. State, 188 Ark. 846, 68 S.W.2d 100 (Sup. Ct. 1934). There a group of bank robbers forced a teller to accompany them outside, where he was shot and killed by a law officer. The court acknowledged the philosophy in Washington, supra and which is referred to herein, that in felony-murder under the Arkansas statute the act of killing must be committed by defendant or by his accomplice acting in furtherance of a common design. Parenthetically, it should be observed that the Arkansas definition of murder is not similar to ours and resembles the California definition. The Arkansas Supreme Court approved the felony-murder doctrine as enunciated by Washington but held that principle was not involved in the case before it for decision. The court went on to say:
*522 "Here the robbers compelled Guthrie [decedent], over his objections and against his will, to accompany them from a place of safety, so far as outsiders were concerned, to a place known by them to be a place of danger from those on the outside. They knew they had been discovered and apprehended danger from the outside, else they would not have taken Guthrie with them. They wished to use him as a breastwork, as it were, or they thought perhaps the outsiders would not shoot at them for fear of killing Guthrie. In doing this they committed another crime, kidnapping, and caused Guthrie's death."
They went on to say that appellants' action in forcing Guthrie to a place which was known to be perilous was just as much the cause of death as if the felon had fired the fatal shot. They affirmed the first degree conviction. Also see Taylor v. State, 41 Tex. Cr. R. 564, 55 S.W. 961 (Tex. Cr. App. 1900); Keaton v. State, 41 Tex. Cr. R. 621, 57 S.W. 1125 (Tex. Cr. App. 1900).
It should be noted here that N.J.S. 2A:118-1, our kidnapping statute, would justify the conclusion that the act of one of the co-felons in forcing decedent at gun point to lead the way, resulted in the death of the victim during an attempt to kidnap. It is the fact, not the distance of forcible removal, which constitutes kidnapping. See People v. Chessman, 38 Cal.2d 166, 238 P.2d 1001 (Sup. Ct. 1951), where a California kidnapping statute quite similar to ours was interpreted. Also see State v. Dunlap, 61 N.J. Super. 582 (App. Div. 1960), certiorari denied 368 U.S. 903, 7 L.Ed.2d 97, 82 S.Ct. 181 (1961).
The Redline, supra, majority recognized the distinction of the above shield cases and saw no conflict between those decisions and the conclusions it reached. It is interesting to note that a concurring opinion in Redline which urged the court to go further than it did, referred (in note 1 on page 501) to the philosophy that "One `commits' a homicide if he deliberately places another in a position of deadly peril from an independent force or agency and death thereby results."
*523 Defendants rely on decisions from several states for the position that the offense does not fit the category of a felony-murder.
People v. Wood, 8 N.Y.2d 48, 201 N.Y.S.2d 328 (Ct. App. 1960), cited by defendants, took note of the peculiar language of the New York statute which read at that time as follows:
"The killing of a human being, unless it is excusable or justifiable, is murder in the first degree, when committed.

* * * * * * * *
2. By an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without a premeditated design to effect the death of any individual; or without a design to effect death, by a person engaged in the commission of, or in an attempt to commit a felony, either upon or affecting the person killed or otherwise; or * * *." (Emphasis added)
Also see McKinney's Consolidated Laws of N.Y. c. 40, Penal Law (Ann. Rev.) § 125.25, effective September 1, 1967.
In People v. Austin, 370 Mich. 12, 120 N.W.2d 766 (Sup. Ct. 1963), a felon was killed by the intended victim and the co-felons were charged with murder. The majority opinion called attention to the Michigan Penal Code which provided:
"All murder which shall be * * * committed in the perpetration, or attempt to perpetrate any * * * robbery * * * shall be murder of the first degree * * *." (Emphasis added)
Reference was made in the opinion to the argument that the statute referred to "all murder," not homicide. Significantly, this was one argument made by the majority in Washington where the court said that the word "murder" in the California statute would have to be expanded beyond common understanding. Not so in the New Jersey statute, N.J.S. 2A:113-1.
Commonwealth v. Balliro, 349 Mass. 505, 209 N.E.2d 308, 14 A.L.R.3d 640 (Sup. Jud. Ct. 1965), while it adopts *524 the theory of Washington and Redline in that under the felony murder doctrine a felon cannot be held responsible for the death of any person killed by someone resisting the commission of a felony, followed Commonwealth v. Campbell, 89 Mass. 541 (Sup. Jud. Ct. 1863), which has been the rule in that State for over 100 years. Significantly, the court noted a difference in the so-called "shield" cases in which persons engaged in the commission of a felony compel the victim of the homicide to occupy a position of danger in order to aid the felons in perpetrating the felony or in making their escape, citing Wilson v. State and Keaton v. State, supra.
While it might be argued that the facts presented in the present case would not justify a murder indictment under the felony murder doctrine, our statute would seem to justify such a charge.
The interpretation to be given N.J.S. 2A:113-1, and particularly the provision that has heretofore been referred to, in my opinion justifies the charge of murder.
For the reasons herein set forth the motion to quash the indictment charging murder is denied and bail, on the principles defined in State v. Obstein, 52 N.J. 516 (1968), will not be granted.