STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
THOMAS WOOTEN, DEFENDANT-APPELLANT.

Argued September 13, 1976—Reargued December 9, 1976—
Decided June 1, 1977.

*Mr. Arnold Mellk,* Deputy Public Defender, and *Mr. David R. Arrajj,* Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender, attorney; *Mr. Mellk* of counsel; *Mr. Arrajj* and *Mr. Ezra D. Rosenberg,* Assistant Deputy Public Defender on the brief).

*Mr. Steven M. Ingis,* Deputy Attorney General, argued the cause for respondent (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. David S. Baime* and *Ms. Barbara Ann Villano,* Deputy Attorneys General of counsel and on the brief).

PER CURIAM. The Court being equally divided, the judgment of the Appellate Division, 135 *N. J. Super.* 6, is affirmed.

PASHMAN, J., dissenting. Defendant Thomas Wooten was one of 41 inmates indicted for various offenses which were committed during the 1971 Rahway State Prison riot. That disturbance began on the evening of November 24, 1971 with a violent assault on the prison superintendent, U. Samuel Vukcevich, by a group of inmates. Vukcevich was attacked in the prison auditorium as he was attempting to calm an unruly crowd of inmates who were shouting and chanting about local grievances. In the course of the attack, he was stabbed several times and slashed with a razor. He was then taken from the auditorium with three other correction officers and forcibly confined in a cell for the next 24 hours while the prisoners and outside officials negotiated over their release.

At about the same time, another correction officer, John Monteyunas, was attacked by an inmate on the top floor of "Four Wing", which is a separate section of the prison facility. The inmate struck Monteyunas on the head and took his keys. Another prisoner assisted the officer by supplying him with a prisoner's uniform and hiding him in a cell on the top floor of "Four Wing", which was under inmate control by that point. He remained there for about 45 minutes until a third inmate discovered his presence and reported it to defendant. With the help of several other prisoners, defendant took Monteyunas from the cell and dragged him from the top floor of "Four Wing" down two floors to Cell 25 where the other hostages were being held. One hostage was re-

leased on November 25 as part of a bargain with negotiating officials; the others were unilaterally released shortly thereafter by their inmate guards.

Defendant was indicted on four counts of aiding and abetting the kidnapping and four counts of aiding and abetting the false imprisoment of these officials.[1] Charges concerning the abduction of officer Benjamin Henderson were dismissed on the State's motion at the close of its case. Those stemming from the seizure of Vukcevich and a third officer initially seized in the auditorium, Alphonse Iorio, resulted in a jury verdict of guilty on the false imprisonment charge and an acquittal on the kidnapping charge. As to Monteyunas, however, the jury found defendant guilty of both kidnapping and false imprisonment. The trial court set aside the conviction of false imprisonment, ruling that it merged with kidnapping. He sentenced defendant to a term of 30 to 31 years on the kidnapping count[2] (the minimum sentence being 30 years under *N. J. S. A.* 2A:118–1), and to two-to-three year sentences on the four other counts, all to be served concurrently with the sentence defendant was then serving in State Prison.

Defendant has attacked the indictment and conviction for kidapping on various grounds. Prior to trial he unsuccess-

---

[1]Defendant was also charged with two counts of assault and battery on a law enforcement officer, in violation of *N. J. S. A.* 2A:90–4. *See State v. Grant,* 102 *N. J. Super.* 164 (App. Div. 1968), certif. den. 53 *N. J.* 62 (1968) (correction officer held to be a "law enforcement officer" under *N. J. S. A.* 2A:90–4). *See also N. J. S. A.* 2A:154–4.

[2]Although 16 other inmates were also charged with kidnapping and false imprisonment, only defendant was convicted of kidnapping. Ten pleaded guilty to the lesser-included crime of false imprisonment in exchange for dismissal of kidnapping counts; five went to trial and had their charges dismissed by the State; one was acquitted. Of the 41 inmates who were indicted for various offenses, only 21 were sentenced, primarily to terms of one-to-two years or less. Two received two-to-three year concurrent terms and three received one-to-two year consecutive terms.

fully moved to dismiss the false imprisonment and kidnapping counts on the ground that the relevant statutes, *N. J. S. A.* 2A:85–1 and *N. J. S. A.* 2A:118–1 respectively, were facially unconstitutional. The trial judge also denied two post-trial motions for a judgment of acquittal on the kidnapping charge and for a new trial. He rejected defendant's argument that movement of a victim within a single building did not constitute sufficient asportation for the purposes of *N. J. S. A.* 2A:118–1, relying instead on the increased risk of danger in moving Officer Monteyunas down two floors to a different cell. He also found sufficient evidence to support the jury's finding that defendant had dragged Monteyunas from one cell to the other.

The Appellate Division affirmed defendant's conviction. 135 *N. J. Super.* 6 (App. Div. 1975). Judge Kolovsky, in an opinion adopted today by three members of our equally divided Court, agreed with the trial court's holding that the movement of Monteyunas from the eighth tier of "Four Wing" to a lower tier two floors below constituted asportation within the meaning of the statute. Stressing the distance of the removal (some 700 feet), he concluded that defendant's argument "lacks a shadow of substance." *Id.* at 11. The Appellate Division also refuted defendant's contention that the asportation was incidental to an underlying crime of assault and battery or false imprisonment. It identified the underlying crime as "kidnapping — an aggravated species of false imprisonment — a crime whose purpose was the taking and holding of a hostage." *Id.* In such cases, it said, any movement, no matter how slight, is enough to satisfy the element of asportation. *Id.* at 12.

We granted certification, 69 *N. J.* 80 (1975), and permitted defendant to submit a supplemental brief raising additional arguments for reversal of his kidnapping conviction, the most substantial of which is that the mandatory minimum penalty of *N. J. S. A.* 2A:118–1 violates constitutional guar-

antees against cruel and unusual punishment. *U. S. Const.*, Amend. VIII, XIV; *N. J. Const.* (1947), Art. I, § 12.[3]

At oral argument, however, it was suggested to counsel that the statutory language requiring movement of a victim from one place "to any other point within this state" might not encompass movement within a single building. At the Court's request, therefore, supplemental briefs were submitted and oral argument held on the significance of the statutory language dealing with asportation as an element in a kidnapping offense.

At issue is the interpretation of the following underscored language in the kidnapping statute, *N. J. S. A.* 2A:118-1:

Any person who kidnaps or steals or forcibly takes away a man, woman or child, and sends or carries, or with intent to send or carry, *such man, woman or child to any other point within this state,* or into another state, territory or country, forces, persuades or entices a child within the age of 14 years to leave its father, mother or guardian, or other person intrusted with its care, and secretes or conceals the child, or who procures any such act to be done, is guilty of a high misdemeanor, and shall be punished by imprisonment for life, or for such other term of not less than 30 years as the court deems proper.

There is no serious dispute concerning the sufficiency of the State's evidence to establish an unlawful seizure, or "taking away," of Officer Monteyunas by defendant. Nor is there any reason to question the jury's finding that defendant personally dragged Monteyunas some 600 to 800 feet, exposing him to kicks and blows from other inmates.[4]

---

[3]Defendant also argues that this sentence violates his right to equal protection, *U. S. Const.*, Amend. XIV; *N. J. Const.* (1947), Art. I, § 1. Finally, he suggests that the Court construe *N. J. S. A.* 2A:118-1 to require a *maximum*, rather than a minimum penalty of 30 years. *See State v. Hampton,* 61 *N. J.* 250, 277–282 (1972) (Weintraub, C. J., dissenting in part). I find no merit in any of these arguments.

[4]Monteyunas testified that seven or eight other inmates accompanied defendant in the trip from the eighth tier to the fourth

Moreover, the evidence indicates that defendant was a leading force in the uprising and in the subsequent negotiations, directing other inmates and exerting considerable influence over events.[5]

The principal issue is whether, by moving the guard from the cell in which he was found to the other cell in "Four Wing," defendant took him "to any other point within this state * * *", within the meaning of *N. J. S. A.* 2A:118-1. As shall be discussed, this language is the final residue of the common law crime which defined kidnapping in terms of a removal of a forcibly seized victim out of the country. Although legislative modifications have largely undercut the common law emphasis on substantial asportation, the statutory language and the historical background, taken together, suggest that the word "point" is used in a geographical sense, comparable to locality, area, municipality or the like. Admittedly, it would be difficult to frame a formula by which to determine the minimum distance satisfying the statute, but there is no difficulty in concluding that removal from one place in a building to another place in the same building, is not within the fair intent of the statutory requirement that asportation be to another "point within this state." This is so whether the building is a private home or a separate unit of a prison facility, as here. Since defendant's movement of Monteyunas occurred within the confines of the

tier of the wing, where Cell 25 was located. Defendant could hardly have performed that feat alone, since he is 5'2" and weighs 120 pounds while Monteyunas is 6'1" and weighs 220 pounds. Although Monteyunas testified that he was pummelled throughout the trip and thoroughly frightened by the experience, he did not say whether he suffered any injuries.

[5]The State's case was largely based on defendant's alleged ability to manipulate and direct other inmates. Its evidence suggested that he had ordered the initial attack on Superintendent Vukcevich which triggered the uprising. The State also stressed that defendant had been a leading participant in the negotiations with outside officials, and that he had supervised the confinement of the hostages.

prison, I would find that his conduct did not constitute kidnapping under *N. J. S. A.* 2A:118–1.

This interpretation of the statute is supported by its evolution from the common law crime of kidnapping. At common law, kidnapping consisted of an unlawful detention of a person (corresponding to the crime of false imprisonment), and the asportation of that person out of his country. 4 Blackstone, *Commentaries on the Law of England* 219 (19 ed. 1850). The extreme requirement of asportation out of the victim's country distinguished kidnapping from the crime of false imprisonment; indeed, kidnapping has often been described as "an aggravated form of false imprisonment." 1 Schlosser, *Criminal Laws of New Jersey* § 46.5 (3 ed. 1970); Perkins, *Criminal Law* 176 (2 ed. 1969); 2 Burdick, *Law of Crime* § 383 (1946); 2 *Bishop on Criminal Law* § 750 (9 ed. 1923). *See also State v. Gibbs,* 79 *N. J. Super.* 315, 323–324 (App. Div. 1963); *State v. Johnson,* 67 *N. J. Super.* 414, 420 (App. Div. 1961); *Midgett v. State,* 216 *Md.* 26, 139 *A.* 2d 209, 215 (1958); *State v. Croatt,* 227 *Minn.* 185, 34 *N. W.* 2d 716, 718–719 (1948); Note, "A Rationale of the Law of Kidnapping," 53 *Colum. L. Rev.* 540, 543–548 (1953); Fisher & McGuire, "Kidnapping and the So-Called Lindbergh Law," 12 *N. Y. U. L. Q. Rev.* 646, 648–649 (1935).

In New Jersey, as in other states, the shortcomings of this narrow common law definition provoked legislative efforts to re-cast the elements of kidnapping to encompass a wider range of acts.[6] The original statutory version of kidnapping, enacted in 1795, included forcible abductions of a person into another state, as well as another country, and prohibited

---

[6]Many states redefined the crime in terms of seizure and asportation *or* confinement for an unlawful purpose. New Jersey is one of the few states to retain the asportation requirement for simple kidnapping. *See* Note, "A Rationale of the Law of Kidnapping," *supra,* 53 *Colum. L. Rev.* at 541–546; Model Penal Code, Commentary at 17 (Tent. Draft No. 11, 1960); Proposed New Jersey Penal Code, 2C:13–1; Commentary at 181–183 (1971).

secret confinements of children under the age of 14. Paterson, *Laws of the State of New Jersey* 218 (1800). The statutory wording of that law has been largely retained in the current statute, *N. J. S. A.* 2A:118–1; the prior provision read as follows:

And be it enacted by the authority aforesaid, that, if any person shall *kidnap, or steal, or forcibly take away any man, woman or child,* bond or free, *and send or carry,* or with intent to send or carry *such man, woman or child from this State into another State or country;* or shall spirit, persuade, or entice any child, within the age of fourteen years, to leave his father, mother or guardian, or other person or persons entusted with the 'care of such child, and the same child shall secrete and conceal, then the person so offending in any of the premises, and his or her procurers shall be adjudged to be guilty of a high misdemeanor, and, on conviction, shall be punished by fine, not exceeding one thousand dollars, or imprisonment at hard labor, not exceeding five years, or both; but neither his act, nor any thing therein contained, shall extend to oppose, obstruct or prevent any master or mistress, who may remove from this State into any other of the United States, from taking with him or her, his or her servants or slaves.
[Emphasis added]

Aside from a minor alteration, the statutory wording "kidnap, or steal, or forcibly take away" has remained unchanged through numerous amendments and revisions. *See State v. Gibbs, supra,* 79 *N. J. Super.* at 323, citing statutes. As interpreted by the court in *Gibbs,* these three verbs together imply an unlawful action of seizure. *Id.* at 324. The subsequent language, "send or carry," bears more directly on movement, implying more than a stationary confinement. Taking them in a literal sense and applying the rule of *ejusdem generis,* they denote a dislocation or removal of a victim from some starting point. As shown above, "kidnap," at common law, referred to movements out of a victim's country. "Steal" has no such specific meaning, but it too implies a taking away of a person or of property from its rightful place. *See Gardner v. State,* 55 *N. J. L.* 17, 24 (Sup. Ct. 1892), aff'd o. b., 55 *N. J. L.* 652 (E. & A. 1893); 2 Schlosser, *supra* at § 66.11. Likewise, "takes away" connotes more than a mere seizure.

Hence, there is considerable force to defendant's argument that the first element of kidnapping — a false imprisonment — need not be an entirely stationary event. This is borne out by the survival of the common law offense in *N. J. S. A.* 2A:85–1, which encompasses an unlawful use of force to compel a person to go where he does not wish to go, as well as to remain where he does not wish to remain. *See* Perkins, *supra* at 173; 3 Blackstone, *supra* at 127.

The other relevant wording from the 1796 statute, "send or carry . . . from this State to another State or country," was amended in 1898 to read "send or carry . . . *to any other point within this state,* or into another state or country." *L.* 1898, *c.* 235, § 114. The State cites this amendment as evidence that the Legislature abandoned the common law emphasis on substantial asportation. However, the amendment of the latter phrase in 1907 to read ". . . or into another state, *territory* or country . . ." [emphasis added] suggests a different conclusion. *L.* 1907, *c.* 55, pp. 103–104. Both the 1898 and 1907 revisions appear to have been designed to close obvious loopholes in the law by including asportations of some distance which did not terminate in another country or state. The Legislature evidently recognized that the dangers associated with removal into another state or country could just as easily be accomplished by removal to another locality within the State or by removal to another territory. Although the use of the word "point" introduces some ambiguity concerning the area of the initial location, its juxtaposition with foreign locales suggests a similar geographical use.

Had the Legislature intended to include movements of insignificant distance or within a single building, it could have defined kidnapping in terms of detention for an unlawful purpose. *Cf. Model Penal Code* § 212.1, Comment at 11 (Tent. Draft No. 11, 1960); Proposed *New Jersey Penal Code* § 2C:13–1, Commenary at 181 (1971). Many states did choose this option, see *ante* at 323 *n.* 6 (Pashman, J., dissenting), but New Jersey retained the same statutory

formula until 1933 when, in the wake of the famed Lindbergh kidnapping, the Legislature dispensed with the requirement of asportation in kidnappings for ransom.[7] Aside from secret confinements of children under the age of 14, which was in the earlier statutory version, see *ante* at 324–325 (Pashman, J., dissenting), this was the only alteration in the statutory definition of the crime. Apart from that, the only other modifications over the years dealt with increases in the statutory penalty, finally resulting in the current mandatory sentence of 30 years. *See State v. Johnson, supra,* 67 *N. J. Super.* at 421.

This latter development dispels whatever doubt there may be concerning the proper construction of the statutory language. It is a cardinal principle of statutory interpretation that penal statutes are to be strictly construed against the State. *State v. Carbone,* 38 *N. J.* 19, 24 (1962); *State v. Provenzano,* 34 *N. J.* 318, 322 (1961); *State v. Meinken,* 10 *N. J.* 348, 352 (1952); *State v. Cannizzaro,* 133 *N. J. L.* 383, 384 (E. & A. 1945); *State v. Woodruff,* 68 *N. J. L.* 89, 93 (Sup. Ct. 1902); 3 *Sutherland, Statutory Construction,* § 59.03 at 6–8 (Sands ed. 1974). This "rule of lenity" rests on the fear that expansive judicial interpretations will create penalties not originally intended by the Legislature. *See State v. Brown,* 22 *N. J.* 405, 415 (1956). Where, as here, the sentence is unusually harsh

---

[7]The change was effected by *L.* 1933, *c.* 374 which added the following as the second paragraph of *N. J. S. A.* 2A:118–1:

Any person who kidnaps or steals or forcibly takes away a man, woman or child, as aforesaid and demands for the return of such man, woman or child, money or any thing of value, is likewise guilty of a high misdemeanor, and upon conviction shall suffer death, unless the jury by their verdict, **and as a part thereof,** upon and after consideration of all the evidence. recommends imprisonment of life, in which case this and no greater punishment shall be imposed.

This portion of the statute is not relevant in this appeal because defendant was indicted under the first paragraph for "simple" kidnapping.

and the statutory meaning is subject to doubt, such a policy is also more humane. As Justice Frankfurter observed in a related context in *Bell v. United States,* 349 *U. S.* 81, 83, 75 *S. Ct.* 620, 622, 99 *L. Ed.* 905, 910 (1955):

When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity. And this not out of any sentimental consideration, or for want of sympathy with the purpose of Congress in proscribing evil or antisocial conduct. It may fairly be said to be a presupposition of our law to resolve doubt in the enforcement of a penal code against the imposition of a harsher punishment.

This threshold determination that the kidnapping statute does not apply to forcible removals within a single building makes it unnecessary for me to address the Appellate Division's arguments. Neither *State v. Hampton,* 61 *N. J.* 250 (1972), which applies to "incidental" movements in the course of other crimes,[8] nor the earlier cases adhering to the *Chessman/Wein* rule,[9] which state that "the fact, not the distance" of removal meets the statutory require-

---

[8]The defendant in *Hampton* broke into the victim's apartment, forced her at gun point to leave her apartment and drive him in her car for about an hour at night. He held a gun on her throughout this time, threatening to shoot her, and did wound her when she finally attempted to escape. We held that the forcible detention and subsequent asportation were not incidental to the underlying crime of breaking and entering; rather they were undertaken deliberately in a manner which increased the risk of harm to the victim. *Id.* at 276.

[9]The principle derives from *People v. Chessman,* 38 *Cal.* 2d 166, 238 *P.* 2d 1001 (1951) (rape victim dragged 22 feet from her car) and *People v. Wein,* 50 *Cal.* 2d 383, 326 *P.* 2d 457 (1958) (victims of robbery and rape moved distances of 6 to 75 feet to their own rooms). It has since been overruled by the California Supreme Court in *People v. Daniels,* 71 *Cal.* 2d 1119, 80 *Cal. Rptr.* 897, 459 *P.* 2d 225 (1969). See Note, 59 *Cal. L. Rev.* 180 (1971) for criticisms of the earlier decisions. *See also,* Enright, "California's Aggravated Kidnapping Statute — A Need for Revision," 4 *San Diego L. Rev.* 285 (1967) ; Comment, "Room to Room Movement; A Risk Rationale for Aggravated Kidnapping," 11 *Stan. L. Rev.* 554 (1959).

ment of asportation, see, e. g., State v. Dunlap, 61 N. J. Super. 582, 589 (App. Div. 1960); State v. Kress, 105 N. J. Super. 514, 522 (Law Div. 1969), have any relevance to this factual pattern. As long as the entire incident occurred within "Four Wing," it makes little difference whether the distance between the cell in which Monteyunas was initially seized and the cell to which he was moved by defendant was 700 feet or 7 feet. There was no removal to another "point" within this State, as the statute requires.

Moreover, as a practical matter, the removal of Monteyunas did not significantly affect his hostage status. By the time he was seized by defendant, the entire area of "Four Wing" was already under inmate control. Defendant could have held the guard as a hostage just as easily without moving him from the cell in which he was discovered. If that had occurred, it is conceded that the State could not have charged defendant with more than false imprisonment. See N. J. S. A. 2A:85–1. But, if I were to accept the Appellate Division's suggestion that any movement, no matter how minimal, meets the asportation requirement when the victim is held as a hostage, see 135 N. J. Super. at 12, it would mean that movement of the officer to the adjoining cell would also have been a kidnapping. Such an interpretation would transform asportation into a purely technical requirement, with virtually no connection to the gravity of the sentence imposed for the crime.

Thus, in the circumstances of this case, defendant's conduct should have subjected him to no more than indictments for false imprisonment and for assault and battery on a correction officer. My judgment that the present kidnapping statute fails to cover this incident does not bear on my view of defendant's conduct. His movement of Monteyunas exposed the officer to a barrage of blows and kicks by other inmates which were physically dangerous and emotionally terrifying. His role throughout the disturbance in dealing with the hostages — particularly his treatment of Superintendent Vukcevich — evidences a similar callousness

which deserves condemnation and punishment. I have little doubt that the Legislature would have dispensed with the element of asportation altogether as a necessary part of the crime of kidnapping, if it had foreseen this sequence of events. A statute similar to that contained in the proposed *New Jersey Model Penal Code,* § 2C:13–1, would define such conduct as kidnapping, and probably should be adopted to remedy the deficiencies of *N. J. S. A.* 2A: 118–1.[10] But since asportation remains an essential part of the current statutory offense, I am unwilling to read it out of existence because *this* defendant deserves punishment.

Although not directly relevant here, it may be noted that the stimulus for *Hampton* and similar decisions[11] was the potential of the *Chessman/Wein* formulation for abusive prosecutions. *See Model Penal Code, supra,* Comment at 13–14; Proposed *New Jersey Penal Code, supra,* Commentary at 182–83. We acknowledged this problem in *Hampton* and repeated Judge Gaulkin's statement in *State v. Johnson* that the prosecutor has a "moral obligation not to

---

[10]Section 2C:12–1(a) of the proposed Code provides:
> A person is guilty of kidnapping if he unlawfully removes another from the place where he is found or if he unlawfully confines another with the purpose of holding that person for ransom or reward *or as a hostage.*
> [Emphasis supplied.]

[11]*See, e. g., People v. Timmons,* 4 *Cal.* 3d 411, 93 *Cal. Rptr.* 736, 482 *P.* 2d 648 (1971); *People v. Daniels,* 71 *Cal.* 2d 1119, 80 *Cal. Rptr.* 897, 459 *P.* 2d 225 (1969); *Cotton v. Superior Court,* 56 *Cal.* 2d 459, 15 *Cal. Rptr.* 65, 364 *P.* 2d 241 (1961); *People v. Adams,* 34 *Mich. App.* 546, 192 *N. W.* 2d 19 (1971), rev'd in part and aff'd in part, 389 *Mich.* 222, 205 *N. W.* 2d 415 (1973); *People v. Miles,* 23 *N. Y.* 2d 527, 297 *N. Y. S.* 2d 913, 245 *N. E.* 2d 688, *cert.* den. 395 *U. S.* 948, 89 *S. Ct.* 2028, 23 *L. Ed.* 2d 467 (1969); *People v. Lombardi,* 20 *N. Y.* 2d 266, 282 *N. Y. S.* 2d 519, 229 *N. E.* 2d 206 (1967); *People v. Levy,* 15 *N. Y.* 2d 159, 256 *N. Y. S.* 2d 793, 204 *N. E.* 2d 842, amended on other grounds, 15 *N. Y.* 2d 910, 258 *N. Y. S.* 2d 646, 206 *N. E.* 2d 653, *cert.* den. 381 *U. S.* 938, 85 *S. Ct.* 1770, 14 *L. Ed.* 2d 701 (1965).

seek an indictment [for kidnapping] unless the crime fairly appears and warrants the heavy punishment." 66 *N. J.* at 275, citing 67 *N. J. Super.* at 422–23. To this we added that the trial and appellate courts have the obligation to review the facts carefully to determine if the separate offense of kidnapping was fairly shown. 66 *N. J.* 275. The same concerns should underly our interpretation of the statute, especially where the legislative intent is subject to legitimate doubt, lest the heavy mandatory penalty of 30 years be applied unrealistically, unfairly or unjustly.

Defendant was sentenced to prison terms for his convictions on two counts of false imprisonment and two counts of assault and battery on a law enforcement officer. Since the trial judge merged the additional false imprisonment conviction relating to Officer Monteyunas with the kidnapping conviction, he did not sentence defendant on that count. I would set aside defendant's conviction for kidnapping and reinstate the conviction for false imprisonment, remanding for further sentencing by the trial judge.

Justice MOUNTAIN and Judge CONFORD join in this opinion.

*For affirmance*—Chief Justice HUGHES and Justices SULLIVAN and SCHREIBER—3.

*For reversal*—Justices MOUNTAIN and PASHMAN and Judge CONFORD—3.