STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
CHURCHDALE LEASING, INC. AND A.C.
ENTERPRISES, DEFENDANTS–APPELLANTS.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. O.J.O.
TRUCKING CORPORATION AND YARDVILLE SUPPLY
COMPANY, DEFENDANTS–APPELLANTS.

Argued May 3, 1988—Decided April 10, 1989.

*H. Richard Chattman* argued the cause for appellants Churchdale Leasing, Inc. and A.C. Enterprises (*Podvey, Sachs, Meanor & Catenacci,* attorneys; *Thaddeus C. Raczkowski* and *Franklin M. Sachs,* on the briefs).

*Louis J. DeMille, Jr.,* argued the cause for appellants O.J.O. Trucking Corporation and Yardville Supply Company (*Charles J. Casale, Jr.,* attorney).

*Stephen H. Monson,* Deputy Attorney General, argued the cause for respondent (*Cary Edwards,* Attorney General of New Jersey, attorney; *Stephen H. Monson* and *Larry R. Etzweiler,* Deputy Attorney General, on the briefs).

The opinion of the Court was delivered by

POLLOCK, J.

These appeals raise the question whether a commercial motor vehicle registered in New Jersey pursuant to *N.J.S.A.* 39:3–20 (Section 20)[1] violates that statute if it is registered at the

---

[1]*N.J.S.A.* 39:3–20 provides:

For the purpose of this act, gross weight means the weight of the vehicle or combination of vehicles, including load or contents.

a. The director is authorized to issue registrations for commercial motor vehicles other than omnibuses or motor-drawn vehicles upon application therefor and payment of a fee based on the gross weight of the vehicle, including the gross weight of all vehicles in any combination of vehicles of which the commercial motor vehicle is the drawing vehicle. The gross weight of a disabled commercial vehicle or combination of disabled commercial vehicles being removed from a highway shall not be included in the calculation of the registration fee for the drawing vehicle.

Except as otherwise provided in this subsection, every registration for a commercial motor vehicle other than an omnibus or motor-drawn vehicle shall expire and the certificate thereof shall become void on the last day of the eleventh calendar month following the month in which the certificate was issued. The minimum registration fee for registration issued after July 1, 1984 shall be as follows:

For vehicles not in excess of 5,000 pounds, $53.50.

For vehicles in excess of 5,000 pounds and not in excess of 18,000 pounds, $53.50 plus $8.50 for each 1,000 pounds or portion thereof in excess of 5,000 pounds.

For vehicles in excess of 18,000 pounds and not in excess of 50,000 pounds, $53.50 plus $9.50 for each 1,000 pounds or portion thereof in excess of 5,000 pounds.

For vehicles in excess of 50,000 pounds, $53.50 plus $10.50 for each 1,000 pounds or portion thereof in excess of 5,000 pounds.

Commercial motor vehicles other than omnibuses or motor-drawn vehicles for which commercial motor vehicle registrations had been issued prior to the effective date of this act and which expire March 31, 1982 shall be issued commercial registrations, which, in the director's discretion, shall expire on a date to be fixed by him, which date shall not be sooner than four months nor later than 16 months following the date of issuance of the registration. The fees for such registrations shall be fixed by the director in amounts proportionately less or greater than the fees established by this subsection.

b. The director is also authorized to issue registrations for commercial motor vehicles having three or more axles and a gross weight over 40,000 pounds but not exceeding 70,000 pounds, upon application therefor and proof to the satisfaction of the director that the applicant is actually engaged in construction work or in the business of supplying material, transporting material, or using such registered vehicle for construction work.

Except as otherwise provided in this subsection, every registration for these commercial motor vehicles shall expire and the certificate thereof shall become void on the last day of the eleventh calendar month following the month in which the certificate was issued.

The registration fee for registrations issued after July 1, 1984 shall be $19.50 for each 1,000 pounds or portion thereof.

For purposes of calculating this fee, weight means the gross weight, including the gross weight of all the gross weight, including the gross weight of all vehicles in any combination of which such commercial motor vehicle is the drawing vehicle. "Constructor" registration issued prior to the effective date of this act, which expire June 30, 1982, shall be issued contractor vehicle registrations, which, in the director's discretion, shall expire on a date to be fixed by him, which date shall not be sooner than four months nor later than 16 months following the date of issuance of the registration. The fees for the registration shall be fixed by the director in amounts proportionately less or greater than the fees established by this subsection.

Such commercial motor vehicle shall be operated in compliance with the speed limitations of Title 39 of the Revised Statutes and shall not be operated at a speed greater than 30 miles per hour when one or more of its axles has a load which exceeds the limitations prescribed in R.S. 39.3–84.

c. The director is also authorized to issue registrations for each of the following solid waste vehicles: two-axle vehicles having a gross weight not exceeding 42,000 pounds; tandem three-axle and four-axle vehicles having a gross weight not exceeding 60,000 pounds; four-axle tractor-trailer combination vehicles having a gross weight not exceeding 60,000 pounds. Registration is based upon application to the director and proof to his satisfaction that the applicant is actually engaged in the performance of solid waste disposal or collection functions and holds a certificate of convenience and necessity therefor issued by the Board of Public Utilities.

Except as otherwise provided in this subsection, every registration for a solid waste vehicle shall expire and the certificate thereof shall become void on the last day of the eleventh calendar month following the month in which the certificate was issued.

The registration fee shall be $50.00 plus $8.50 for each 1,000 pounds or portion thereof in excess of 5,000 pounds.

Solid waste vehicles for which commercial motor vehicle registrations had been issued prior to the effective date of this act and which shall expire June 30, 1982 shall be issued solid waste registrations, which, in the director's discretion, shall expire on a date to be fixed by him, which date shall not be sooner than four months or later than 16 months following the date of issuance of the registration. The fees for the registration shall be fixed by the director in amounts proportionately less or greater than the fees established by this subsection.

d. The director is also authorized to issue registrations for commercial motor-drawn vehicles upon application therefor. The registration year for commercial motor-drawn vehicles shall be April 1 to the following March 31 and the fee therefor shall be $18.00 for each such vehicle.

At the discretion of the director, an applicant for registration for a commercial motor-drawn vehicle may be provided the option of registering such vehicle for a period of four years. In the event that the applicant for registration exercises the four-year option, a fee of $64.00 for each such vehicle shall be paid to the director in advance.

If any commercial motor-drawn vehicle registered for a four-year period is sold or withdrawn from use on the highways, the director may, upon surrender of the vehicle registration and plate, refund $16.00 for each full year of unused prepaid registration.

e. It shall be unlawful for any vehicle or combination of vehicles registered under this act, having a gross weight, including load or contents, in excess of the gross weight provided on the registration certificate to be operated on the highways of this State.

The owner, lessee, bailee or any one of the aforesaid of a vehicle or combination of vehicles, including load or contents, found or operated on any public road, street or highway or on any public or quasi-public property in this State with a gross weight of that vehicle or combination of vehicles, including load or contents, in excess of the weight limitation permitted by the certificate of registration for the vehicle or combination of vehicles, pursuant to the provisions of this section, shall be assessed a penalty of $500.00 plus an amount equal to $100.00 for each 1,000 pounds or fractional portion of 1,000 pounds of weight in excess of the weight limitation permitted by the certificate of registration for that vehicle or combination of vehicles. A vehicle or combination of vehicles for which there is no valid certificate of registration is deemed to have been registered for zero pounds for the purposes of the enforcement of this act, in addition to any other violation of this Title, but is not deemed to be lawfully or validly registered pursuant to the provisions of this Title.

maximum authorized registration weight and its gross weight exceeds this maximum. More specifically, the question in *State v. Churchdale Leasing, Inc. and A.C. Enterprises* is whether a commercial vehicle registered for 80,000 pounds, the maximum possible weight under Section 20, violates the statute if it is operated on the highways of this State at a weight in excess of the maximum registered weight. The question in *State v. OJO Trucking Corp. and Yardville Supply Co.* is whether a vehicle registered pursuant to *N.J.S.A.* 39:3–20b (Section 20b) as a "constructor" vehicle for 70,000 pounds, the maximum authorized registration weight for such a vehicle, violates Section 20 if it is operated in excess of that maximum weight on the highways of this State. The *Churchdale* appeal also requires us to decide whether the owner of a commercial vehicle registered for 80,000 pounds but operated in excess of that weight may be punished in a single trial for both a registration violation under Section 20 and an excess weight violation under *N.J.S.A.* 39:3–84b (Section 84b).[2]

---

This section shall not be construed to supersede or repeal the provisions of section 39:3–84, 39:4–75, or 39:4–76 of this Title.

[2] *N.J.S.A.* 39:3–84b provides:

No vehicle or combination of vehicles, including load or contents, found or operated on any public road, street or highway or any public or quasi-public property in this State shall exceed the weight limitations set forth in this Title. Violations shall be enforced pursuant to subsection j. of section 5 of P.L.1950, c. 142 (C. 39:3–84–3).

Where enforcement of a weight limit provision of this Title requires a measurement of length between axle centers, the distance between axle centers shall be measured to the nearest whole foot or whole inch, whichever is applicable, and when the measurement includes a fractional part of a foot equaling six inches or more or a fractional part of an inch equaling one-half inch or more, the next larger whole foot or whole inch, whichever is applicable, shall be utilized. The term "tandem axle" as used in this act is defined as a combination of consecutive axles, consisting of only two axles, where the distance between axle centers is 40 inches or more but not more than 96 inches.

In addition to the other requirements of this section and notwithstanding any other provision of this Title, no vehicle or combination of vehicles, including load or contents, shall be operated in this State, unless by special

We hold that even when a commercial motor vehicle is registered for the maximum weight,[3] if the weight of the vehicle exceeds the gross weight provided on the registration certificate, the vehicle is in violation of Section 20. We further hold, however, that the State may not impose cumulative punishment for both a registration violation under Section 20e and an excess-weight violation under Section 84b.

–I–

The facts in both cases are undisputed. From June 12, 1985, through November 15, 1985, the state police issued sixty summonses to Churchdale Leasing (Churchdale) and A.C. Enterprises (A.C.) for registration-certificate and excess-weight violations for tractor-trailer combinations used to haul solid waste. Churchdale and A.C. do not claim that their vehicles were registered as "solid waste" vehicles under *N.J.S.A.* 39:3–20c, and the exemptions for that type of vehicle under *N.J.S.A.* 39:3–84.1a[4] do not apply. The parties have stipulated that

permit authorized by this Title, with a gross weight, single or multiple axle weight, or gross weight of two or more consecutive axles, the allowance of which would disqualify the State of New Jersey or any department, agency or governmental subdivision thereof for the purpose of receiving federal highway funds.

[3]Although Section 20 does not specify a maximum weight, section 84b(4) provides: "The maximum total gross weight imposed on the highway or other surface by a vehicle or combination of vehicles, including load or contents, shall not exceed 80,000 pounds." The parties agree that the maximum registration weight for defendants' trucks is 80,000 pounds.

[4]*N.J.S.A.* 39:3–84.1a provides:
   The axle weight limitations as provided at R.S. 39:3–84b, shall apply to all vehicles registered in New Jersey subsequent to March 1, 1950, which have not been registered therein or contracted for purchase by New Jersey residents prior to that date. The weight limitations provided at R.S. 39:3–84b(1); R.S. 39:3–84b(2); and R.S. 39:3–84b(3) relative to maximum gross axle weights shall not apply to vehicles registered as "constructor" or "solid waste" vehicles or to a combination of vehicles of which the "constructor" or "solid waste" vehicle is the drawing vehicle as provided at

defendants' vehicles were registered for the 80,000–pound maximum weight allowed by Section 20 and that the operating weights as alleged by the state police were accurate. Twenty-nine of the summonses allege violations of Section 20 for operating a vehicle in excess of the gross weight provided on the registration certificate. The other thirty-one summonses alleged violations of Section 84b, including eighteen summonses for exceeding a tandem-axle weight of 34,000 pounds, contrary to Section 84b(2), and thirteen summonses for exceeding a gross-vehicle weight of 80,000 pounds, contrary to Section 84b(4). Axle- and gross-weight violations constitute separate offenses, the penalty for which "shall be only for the violation involving the greater or greatest excess weight." *N.J.S.A.* 39:3–84.3k.

Of the sixty summonses, seventeen were prosecuted in the Pennsauken Township Municipal Court. Eight of these summonses charged Churchdale and A.C. with violations of Section 20, and nine other summonses charged them with violations of Section 84b. In all but one instance, two summonses were issued each time a vehicle was stopped, with one summons alleging a violation of Section 20 and the other alleging a

---

R.S. 39:3–20, except that said limitations shall apply to vehicles registered as "solid waste" when operated on any highway which is part of the National System of Interstate and Defense Highways, as provided at 23 U.S.C. § 103(e). Except as otherwise provided in this section, the provisions of R.S. 39:3–84b(5) shall apply to vehicles registered as "constructor" or "solid waste" or to a combination of vehicles of which the "constructor" or "solid waste" vehicle is the drawing vehicle as provided in R.S. 39:3–20, except that for any vehicle registered as a "constructor" or any combination of vehicles of which the drawing vehicle is registered as a "constructor," the provisions of R.S. 39:3–84b(5) shall not apply; provided the vehicle or combination of vehicles is operated within an area that is 30 miles or less from the point established as a headquarters for the particular construction operation. Vehicles registered as "constructor" or "solid waste" or a combination of vehicles of which the "constructor" or "solid waste" vehicle is the drawing vehicle shall be limited to a maximum gross vehicle weight, including load or contents, as shown on the registration certificate of that vehicle.

violation of Section 84b. In one instance, a single summons was issued, charging a violation of Section 84b(2).

Defendants pled guilty to the excess-weight violations under Section 84b, which carry fines ranging from $72.80 to $351.60 per violation, but not guilty to the registration violations under Section 20, the fines for which range from $800 to $2,200 per violation. Churchdale and A.C. were subsequently convicted by the Municipal Court on the Section 20 violations. On an appeal *de novo* to the Superior Court, Law Division, Camden County, they were again convicted of all charges, and the court imposed fines ranging from $800 to $2,200 for the violations of Section 20.

The remaining forty-three complaints against Churchdale and A.C. were prosecuted in the Lumberton Township Municipal Court. Twenty-one of those complaints charged violations of Section 20, and the other twenty-one charged violations of Section 84b. As in the Pennsauken cases, defendants pled guilty to the charges under Section 84b, but not guilty to the charges under Section 20. Subsequently, however, they were convicted on all charges. On an appeal *de novo* to the Superior Court, Law Division, Burlington County, they were again found guilty of all charges of Section 20, and fines from $628 to $2,360 were imposed. The Appellate Division affirmed the convictions under Section 20 "without prejudice to the State moving in the Superior Court, Law Division, Burlington County, to correct the fines entered in that court." 217 *N.J.Super.* 307, 313 (1987).

Turning to the appeal of OJO Trucking Corporation (OJO) and Yardville Supply Company (Yardville), on October 8, 1984, a concrete truck registered to Yardville as a constructor vehicle weighing 70,000 pounds was operated at a weight of 75,700 pounds in Cranbury Township. Also in Cranbury Township, on January 3, 1985, two of OJO's dump trucks, which were registered at 70,000 pounds, were operated at gross-vehicle weights of 73,000 and 73,640 pounds. State police filed com-

plaints charging Yardville and OJO with violations of Section 20 only.

On the premise that they registered at the maximum allowable weight for constructor vehicles under Section 20b, defendants contend that they cannot be liable under that section. The municipal court disagreed, and defendants were convicted of the three registration violations. After a trial *de novo* on the record, the Law Division found defendants had not violated Section 20 and therefore dismissed the complaints. On the State's appeal, the Appellate Division reversed and remanded the matter to the Law Division for the entry of judgments finding defendants guilty and reimposing the fines. 217 *N.J. Super.* at 313.

We granted defendants' petitions for certification, 109 *N.J.* 44 (1987), and now affirm in part and reverse in part the judgment of the Appellate Division. More specifically, we affirm the judgments of conviction against OJO, Yardville, Churchdale, and AC. We remand the Churchdale and AC matter to the Law Division for resentencing.

–II–

Section 20, which applies to the registration of commercial vehicles, permits the owner to select the authorized gross weight for its vehicle within the statutory limits. A commercial motor vehicle may be registered pursuant to *N.J.S.A.* 39:3–20a (Section 20a) for a maximum gross weight, including load, of 80,000 pounds. Furthermore, a vehicle may be registered pursuant to Section 20b as a "constructor" vehicle for a maximum gross weight, including load, of 70,000 pounds. Section 20 imposes a graduated fee based on the registered gross weight: the heavier the vehicle, the higher the fee. Registration fees for ordinary commercial motor vehicles registered under Section 20a range from $53.50 for a vehicle under 5,000 pounds to $841 for a vehicle registered at the maximum allowable weight of 80,000 pounds. Registration fees for constructor vehicles

under Section 20b range from $780 for a 40,000 pound vehicle to $1,365 for a vehicle registered at the maximum allowable weight of 70,000 pounds. Registering a truck as a constructor vehicle, therefore, subjects the owner of the vehicle to higher registration fees and reduced allowable weight, but, pursuant to *N.J.S.A.* 39:3–84.1, exempts the vehicle from the axle-weight limitations imposed by Section 84b. Section 20e declares unlawful and sets forth fines for the operation of a vehicle in excess of its registered weight. Here, in every instance in which defendants are charged with a violation, their vehicles were operated at a gross weight "in excess of the gross weight provided on the registration certificate." *N.J.S.A.* 39:3–20c.

Notwithstanding the plain language of the statute, defendants argue that the Legislature intended Section 20 to be a revenue-raising statute designed to discourage owners from depriving the State of registration fees by "underregistering" their vehicles. Defendants assert that they registered their vehicles at the maximum allowable weight, and therefore paid the highest registration fees. Their argument continues that because they have not underregistered their vehicles, they have not deprived the State of revenue. Defendants conclude that they may be penalized only for excess-weight violations under the "overweight" statute, Section 84b and Section 84.1, not for underregistration under Section 20.

Section 84 regulates the size and weight of all vehicles, not just those vehicles registered in New Jersey, that travel on the State's highways. Section 84b addresses permissible height, length, and width dimensions, and establishes maximum allowable weights for single axles, *N.J.S.A.* 39:3–84b(1) and (3); tandem axles, *N.J.S.A.* 39:3–84b(2); and combinations of axles, *N.J.S.A.* 39:3–84b(5). Furthermore, *N.J.S.A.* 39:3–84b(4) sets a maximum gross-weight limitation of 80,000 pounds, which is the maximum weight allowable for New Jersey to remain eligible for federal highway funds. *See* 23 *U.S.C.* § 127. Section 84.1 provides that vehicles registered as constructor vehicles "shall be limited to a maximum gross vehicle weight, including load or

contents, as shown on the registration certificate of that vehicle."

Violations of Sections 84b and 84.1 are deemed "excess weight violations" and are subject to mandatory fines pursuant to *N.J.S.A.* 39:3–84.3j.[5]

The essence of defendants' argument is that Sections 84 and 20 serve mutually exclusive purposes. They correctly assert that Section 84b is an excess weight provision, and that the purpose of penalties imposed under Section 84.3 is to deter damage to the highways. *See, e.g., State v. Genesis Leasing Corp.,* 197 *N.J.Super.* 284, 293 (App.Div.1984); *State v. E.H. Miller Transp. Co., Inc.,* 74 *N.J.Super.* 474, 479 (App.Div.), certif. den., 38 *N.J.* 306 (1962); *State v. Gratale Bros., Inc.,* 26 *N.J.Super.* 581, 584 (App.Div.1953). In contrast, the purpose of Section 20, so defendants argue, is to raise revenue, a result that the statute achieves by penalizing underregistration. In sum, defendants contend that the Legislature intended that Sections 20 and 84 address separate needs and that the penalty provisions of each section should be used to prevent subverting the goals of that statute only.

The Appellate Division accepted the premise that Section 20 is largely a revenue-raising statute, but rejected defendants' contention that Section 20 was designed solely to discourage underregistration, stating:

---

[5]*N.J.S.A.* 39:3–84.3j provides:

The owner, lessee, bailee or any one of the aforesaid of any vehicle or combination of vehicles found or operated on any public road, street or highway or on any public or quasi-public property in this State, with a gross weight of the vehicle or combination of vehicles, including load or contents, in excess of the weight limitations as provided at subsection b. of R.S. 39:3–84 or section 3 of P.L.1950, c. 142 (C. 39:3–84) shall be fined an amount equal to $0.02 per pound for each pound of the total excess weight; provided the total excess weight is 10,000 pounds or less, or shall be fined an amount equal to $0.03 per pound for each pound of the total excess weight; provided the total excess weight is more than 10,000 pounds, but in no event shall the fine be less than $50.00.

It is clear that defendants have focused their argument on the assumption that the court should view *N.J.S.A.* 39:3–20 on a single vehicle basis meaning that the Legislature intended only to discourage underregistration of individual vehicles. But we see no basis for that conclusion. Obviously, fining a vehicle operator for violating an 80,000 pound registration certificate will encourage him to acquire additional vehicles and thus pay additional registration fees. Accordingly, by applying *N.J.S.A.* 39:3–20(e) the way it is written, we further the Legislature's purpose of raising revenue from truck registrations. [217 *N.J.Super.* at 312.]

Our review of the statutory history of Sections 20 and 84 does not reveal support for the Appellate Division's conclusion that Section 20 was designed in part to encourage vehicle operators to purchase more trucks. We find, however, that the Legislature intended owners of vehicles that operated at a weight "in excess of the gross weight provided on the registration certificate" to be subject to a penalty under Section 20e, even if the vehicle was registered at the maximum weight allowable. Our conclusion is founded on the statutes' language, structure, and history.

Without setting forth the entire history of Sections 20 and 84, it suffices to note that until 1983 the penalty for violating Section 20 was contained in Section 84.3 along with the penalties for gross- and axle-weight violations. In 1966, the Legislature amended Section 84.3 to provide that when the operating weight of a vehicle exceeded more than one weight limitation—registered-weight, gross-weight, or axle-weight—the penalty assessed, as distinguished from the offenses charged, was to be based on the violation involving the greater weight or the greater excess weight. *L.* 1966, *c.* 209. Conceivably, the Legislature anticipated that the operation of a vehicle could simultaneously violate more than one weight provision and that the State would issue a summons for each violation. Nonetheless, the Legislature determined that the owner would be punished only for the most costly violation.

Defendants argue that the statutory history supports their claim that Section 20e is a revenue statute and that the purpose of the penalties under Section 20e is to discourage depriving the State of revenue through underregistration. They find confir-

mation of their argument in the 1984 amendments to *N.J.S.A.* 39:3–20, which increased registration fees for all weight categories and raised the penalty under Section 20e for operating a vehicle with a weight in excess of that provided on its registration certificate to $500 plus $100 for each 1,000 pounds of excess weight.

To buttress their contention that Section 20 is designed to prevent only underregistration, defendants point to *Attorney General's Formal Opinion* No. 11–1979 (May 14, 1979). In that opinion, the Attorney General stated that Section 84.3—which at that time contained the penalty provision for a violation of Section 20—is "the enforcement arm of a revenue measure (*N.J.S.A.* 39:3–20) the purpose of which is to compel voluntary payment of the correct registration fee to the State of New Jersey by the owners of trucks registered *in this State.*" The opinion, however, was issued in the context of a request whether the penalties for operating a vehicle in excess of the weight provided on the vehicle's registration certificate would apply to vehicles registered out-of-state. Because the fines were designed to prevent the deprivation of revenue to New Jersey, and foreign registered trucks owed nothing to New Jersey for registration, the Attorney General concluded that the penalties for a registration violation were not intended to apply to foreign registered trucks. The opinion does not address the issue before us: whether the Legislature intended that a vehicle registered in New Jersey for the maximum weight allowable may be fined under Section 20e if the vehicle is operated in excess of the registered weight.

The defendants also rely on statements made at a public hearing before the Senate Transportation Communications Committee regarding the 1984 amendments to Section 20e. Specifically, they point to the following statement made by John P. Sheridan, Jr., Commissioner of the Department of Transportation:

I think if I understand what Mr. Nutt [the Director of the Financial Management Unit of the New Jersey Department of Transportation] is saying, the

penalties [in the 1984 amendments to *N.J.S.A.* 39:3–20e] were set up to make it clear that it was going to be a disincentive if you were going to purposely register a truck at a weight below what you would be carrying. [Public Hearing before Senate Transportation and Communications Committee on Senate Bill 1446 (New Jersey Transportation Trust Fund Authority Act of 1984, at 50) (Public Hearing).]

Later in his testimony, however, Commissioner Sheridan stated:

I think the general philosophy of the penalty provision [in *N.J.S.A.* 39:3–20e] is that we do not want overweight trucks on our roads. What you have to discourage through the use of the penalty is carrying overweight where the penalty is so low that it is worth it for truckers to carry the extra weight and pay the penalty. We don't want that. We want to make sure these vehicles are not overweight, and the way to discourage that is by imposing appropriate penalties which will discourage that practice. [*Id.* at 51.]

Further, in explaining why the $30 million increase for the highway trust fund should be derived from heavy truck registration fees, Commissioner Sheridan testified:

The explanation for that is simple. The heavier the truck, the greater the damage it does to highways and bridges.

That realization, based on extensive studies and research, was the basis for the Federal Surface Transportation Assistance Act of 1982, enacted by the Congress of the United States.

And, the American Association of State Highway and Transportation Officials has released its own report which I believe each member of this Committee has received. That report states that one 80,000 pound heavy truck does the same amount of damage to bridges and highways as 9,600 cars. [*Id.* at 37–38.]

This testimony supports the State's contention that Section 20e was designed to recoup not merely revenues that would have been received if the vehicle had been properly registered, but also, as here, revenue that might have been saved had trucks not been operated on the highways in excess of the weight provided on their registration certificates. As the State points out, Section 20, which applies only to those motor vehicles and operators who are subject to the State's registration requirements, is consistent with the premise that trucks registered in New Jersey use the State's roadways more than foreign trucks, and therefore should contribute more to the maintenance of State roads.

We conclude that Sections 20 and 84 should be read as part of a comprehensive legislative scheme for regulating overweight motor vehicles. In adopting both sections, the Legislature was concerned with protecting the State's highways from damage. By imposing the Section 20e penalties on owners of vehicles registered in New Jersey who operate their vehicles above the registered weight, whether or not at the statutory maximum weight, the legislative scheme spreads the costs of maintaining the road system among those vehicles that presumably use the roads the most. So viewed, the system of graduated registration fees based on registered weight requires merely that heavier trucks pay their fair share of highway maintenance. Otherwise, as Commissioner Sheridan observed in testifying in support of increasing the fines under Section 20 for overweight vehicles registered in New Jersey, "the heaviest trucks are not paying appropriate amounts for the damage they are causing to our highways." *Public Hearing, supra,* at 49. A fine under Section 20 for operating a truck in excess of its registered weight assures not only that the owner pays the appropriate registration fee, but also that the owner contributes its fair share to the damage to the State's road system.

In sum, the Legislature designed a scheme to protect the State's road system from overweight vehicles whether the vehicles are registered in New Jersey or are registered elsewhere and merely operated in this state. That conclusion is buttressed by the last sentence of Section 20, which provides that the section does not "supersede or repeal" Section 84. Thus, Section 20 recognizes that it is a separate statute apart from Section 84 and that an owner's operation of a vehicle above the maximum registered weight violates both Sections 84 and 20. By operating vehicles in excess of their registered weight, even though the vehicles were registered at the statutory maximum, defendants violated Section 20.

As to OJO and Yardville, the case for sustaining both violations is even stronger. They elected to register their vehicles as "constructor" vehicles under *N.J.S.A.* 39:3–20b, thereby ob-

taining exemption from axle-weight limitations set forth in *N.J.S.A.* 39:3–84b. In exchange for the exemption from the axle-weight limitation, the statute reduces the maximum registration weight of a constructor vehicle to 70,000 pounds. Owners who operate their vehicles over the 70,000–pound limitation, but below the 80,000–pound gross-weight limitation, would escape paying for their fair share of damage caused to the State's roadways if they were not subject to a penalty under Section 20e.

–III–

Churchdale and A.C. further argue that convictions and punishment for both registration violations under Section 20e and excess weight violations under Section 84b(4) contravene the prohibition against double jeopardy contained in the fifth amendment of the United States Constitution and in article 1, paragraph 11 of the New Jersey Constitution. This argument applies to the thirteen instances in which two summonses were issued, one charging a Section 20 registration violation and the other a Section 84b(4) gross-weight violation. Defendants do not dispute on double-jeopardy grounds the sixteen instances in which two summonses were issued, one charging a Section 20 registration violation and the other a Section 84b(2) axle-weight violation. Additionally, defendants contend that under New Jersey law, the convictions for the Section 20 violations must be merged with the convictions for the Section 84b(4) violations.

The Appellate Division declined to reach defendants' double-jeopardy argument because the issue had not been raised in the Law Division. 217 *N.J.Super.* at 313. When an issue is of sufficient public concern, however, we may consider it even if it is raised for the first time on appeal. *Nieder v. Royal Indem. Ins. Co.*, 62 *N.J.* 229, 234 (1973); *see also Atkinson v. Parsekian*, 37 *N.J.* 143, 153 (1962) ("Although they did not raise this issue [double jeopardy] before the Acting

Director, we will consider it because a constitutional question is presented.").

In the present case, we need not predicate our decision on double-jeopardy analysis because we conclude as a matter of statutory construction that defendants may not be punished under both Section 20e and Section 84b(4). The same result would obtain, however, were we to proceed, as defendant urges, under federal double-jeopardy principles. We do not reach the hypothetical question whether the double-jeopardy clause of article 1, paragraph 11 of the New Jersey Constitution would preclude the imposition of multiple penalties if those penalties were permitted under the federal constitution.

■ Our beginning point is the traditional preference for resolving questions of legislative intent through statutory construction rather than constitutional analysis. *See Simpson v. United States,* 435 *U.S.* 6, 12, 98 *S.Ct.* 909, 913, 55 *L.Ed.*2d 70, 76 (1978). When a statute is clear on its face, a court need not look beyond the statutory terms to determine the legislative intent. *State v. Butler,* 89 *N.J.* 220, 226 (1982). Here, however, the statute does not expressly state whether a defendant who is convicted of violating both Sections 20e and 84b(4) is subject to multiple penalties. Consequently, our search for the intent of the Legislature turns to the legislative history and relevant rules of statutory construction. *See Butler, supra,* 89 *N.J.* at 227. We begin with the legislative history.

Until 1983 the penalty for violating Section 20 was contained in Section 84.3, which also set forth the penalties for gross- and axle-weight violations. From 1966 to 1983, Section 84.3 provided:

Whenever it is found that there is a weight in excess of any 2 or more of said weight limitations [axle, gross, or registration], the fine shall be levied only for the violation involving the greater or greatest excess weight.

Through this provision, the Legislature explicitly prohibited cumulative punishment for a registration violation under Section 20 and a gross-weight (or axle-weight) violation under Section 84. Pursuant to this provision, it was clear that an

operator would pay only the greatest fine levied if he operated his vehicle in excess of axle, gross, and registered weight.

In 1983, the Legislature amended Section 20 to provide for separate penalties for registration violations and simultaneously amended Section 84 to apply only to axle- and gross-weight limitations. The Legislature retained the above-quoted provision in a new Section 84.3k. Because the amended 1983 version of Section 84 no longer addresses registration violations, the fines in Section 84.3k apply only to gross- and axle-weight violations. *N.J.S.A.* 39:3–84.3k. Consequently, the statute on its face neither bars nor allows multiple punishment for a registration and gross-weight violation.

The State argues that removal of the registration penalty from Subsection 84.3k (previously *N.J.S.A.* 39:3–84) and creation of a separate penalty scheme for a registration violation "bespeak a clear intent by the legislature to establish separate and independent penalties." We disagree. Nowhere in any of the 1983 amendments does the Legislature specify whether a registration penalty may be levied in addition to an axle- or gross-weight penalty or whether the former prohibition against cumulative punishment still applies to all three types of violations. Although the amendments alter the structure of the penalty scheme for weight violations, the legislative intent to impose cumulative punishment is ambiguous.

█ In the absence of a clear message from the Legislature, we are remitted to principles of statutory construction to ascertain the legislative intent. One such principle is that penal statutes that are open to more than one reasonable construction must be construed strictly against the State, *State v. Valentin,* 105 *N.J.* 14, 18 (1987); *State v. Wooten,* 73 *N.J.* 317, 326 (1977).

At the heart of the rule requiring strict construction of criminal statutes is the principle of due process. *In re Suspension of DeMarco,* 83 *N.J.* 25, 36 (1980). That principle imposes a duty on the Legislature to forewarn defendants of the cost of illegal activity. Strict construction also serves to curb the

possibility of the abuse of prosecutorial and judicial discretion that could follow from the imposition of penalties not clearly prescribed by the Legislature.

■ Our review of the legislation and its history leaves us uncertain whether the Legislature intended that the 1983 amendments should result in the imposition of cumulative fines for registration and gross-weight violations. We are unpersuaded that the separation of registration penalties from gross-weight penalties bespeaks a clear legislative intent to overcome the statute's historical prohibition of cumulative punishment. If the Legislature had intended to overcome that prohibition, it easily could have stated as much in Section 20e. In the absence of a clear expression of legislative intent, we find as a matter of statutory interpretation that the State is limited to the recovery of penalties for one violation or the other, but not both.

Although we conclude as a matter of legislative intent that defendants may not be subject to multiple punishment, the same result would follow from our analysis of the double-jeopardy argument presented by the parties. The United States Supreme Court has interpreted the double-jeopardy clause to provide three forms of constitutional protection:

> It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense. [*North Carolina v. Pearce*, 395 *U.S.* 711, 717, 89 *S.Ct.* 2072, 2076, 23 *L.Ed.*2d 656, 664–65 (1969) (citations omitted).]

Here, defendants assert the third form of protection, "against multiple punishments for the same offense."

As explained by the United States Supreme Court, when multiple punishment is involved, "the Double Jeopardy Clause does not [sic] more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 *U.S.* 359, 366, 103 *S.Ct.* 673, 678, 74 *L.Ed.*2d 535, 542 (1983).

Summarizing the protection afforded by the bar on multiple punishment, then Justice Rehnquist wrote:

In contrast to the double jeopardy protection against multiple trials, the final component of double jeopardy—protection against cumulative punishments—is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature. Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, the question under the Double Jeopardy Clause whether punishments are "multiple" is essentially one of legislative intent. [*Ohio v. Johnson*, 467 *U.S.* 493, 499, 104 *S.Ct.* 2536, 2541, 81 *L.Ed.*2d 425, 433, *reh'g denied*, 468 *U.S.* 1224, 105 *S.Ct.* 20, 82 *L.Ed.*2d 915 (1984) (citations omitted).]

When the legislative intent is unclear, however, the Court has directed that a statute should be construed in accordance with the rules of statutory construction enunciated in *Blockburger v. United States*, 284 *U.S.* 299, 304, 52 *S.Ct.* 180, 182, 76 *L.Ed.* 306, 309 (1932). *See Whalen v. United States*, 445 *U.S.* 684, 691–92, 100 *S.Ct.* 1432, 1437–38, 63 *L.Ed.*2d 715, 723–24 (1980); *Simpson, supra*, 435 *U.S.* at 11, 98 *S.Ct.* at 912, 55 *L.Ed.*2d at 76. In this regard, *Blockburger* states that

[t]he applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not. [284 *U.S.* at 304, 52 *S.Ct.* at 182, 76 *L.Ed.* at 309.]

The assumption underlying the *Blockburger* test is that the Legislature "ordinarily does not intend to punish the same offense under two different statutes." *Whalen, supra*, 445 *U.S.* at 691–92, 100 *S.Ct.* at 1437–38, 63 *L.Ed.*2d at 723–24. Because it is a rule of statutory construction, when the legislative intent is clear from the face of the statute or the legislative history, the *Blockburger* test is not controlling. *Garrett v. United States*, 471 *U.S.* 773, 779, 105 *S.Ct.* 2407, 2411, 85 *L.Ed.*2d 764, 771 (1985); *Albernaz v. United States*, 450 *U.S.* 333, 340, 101 *S.Ct.* 1137, 1143, 67 *L.Ed.*2d at 275, 282. Thus, when

a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under Blockburger, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial. [*Hunter, supra*, 459 *U.S.* at 368–69, 103 *S.Ct.* at 679, 74 *L.Ed.*2d at 544.]

In *Hunter*, the statute under which multiple punishment was imposed stated that the penalty for armed criminal action "shall be in *addition* to" any other imposed punishment. 459 *U.S.* at 362, 103 *S.Ct.* at 676, 74 *L.Ed.*2d at 539. The United States Supreme Court held, therefore, that the defendant could be sentenced to ten years for the first-degree robbery he committed with a revolver and fifteen years for armed-criminal conviction. *Id.* at 362, 103 *S.Ct.* at 676, 74 *L.Ed.*2d at 540. As construed in *Hunter*, the constitutional protection against double jeopardy does not prohibit multiple punishment of two statutory offenses involving essentially the same conduct tried in a single trial when there is a clear expression of legislative intent to impose punishment for those offenses.

To some extent, it may seem circular to restrict constitutional protection to the terms of a statute the constitutionality of which is to be determined by legislative intent. One might wonder, therefore, whether the constitutional protection against the imposition of multiple punishments serves any useful purpose if it permits multiple punishments only when the Legislature so intends. *See* Westen, *The Three Faces of Double Jeopardy: Reflections on Government Appeals of Criminal Sentences*, 78 *Mich.L.Rev.* 1001, 1025–26 (1980).

Here, however, Sections 20e and 84.3 do not clearly indicate whether multiple punishment may be imposed for both a gross-weight and a registration violation. Thus, the *Hunter* criterion is not satisfied, and we are remitted to determining whether the two offenses are the same under *Blockburger*. If the second offense requires no proof beyond that which is required for conviction of the first offense, the two offenses are the same for double-jeopardy purposes. *Brown v. Ohio*, 432 *U.S.* 161, 168, 97 *S.Ct.* 2221, 2226–27, 53 *L.Ed.*2d 187, 196 (1977). For the double-jeopardy bar on multiple punishment to apply, not only must the second offense require no proof beyond that required in the first offense, but also proof of the first offense must establish the second offense. *Illinois v. Vitale*, 447 *U.S.* 410, 417, 100 *S.Ct.* 2260, 2265–67, 65 *L.Ed.*2d 228, 236 (1980); *accord*

*State v. Dively,* 92 *N.J.* 573, 581 (1983). When this test is satisfied, the offenses are the "same," and cumulative punishment violates the double-jeopardy clause.

Pursuing this analysis, the question is whether proof of a violation of Section 20e or Section 84b(4) entails proof of a fact not required to prove a violation of the other section. In one sense, the two sections do not describe the "same offense." Section 20e requires proof that the vehicle was registered in New Jersey and that the gross weight of the vehicle exceeded the registration weight, facts not required for proof of an excess-weight violation under Section 84b(4). An excess-weight violation under Section 84b(4), by contrast, requires proof that the gross weight of the vehicle while being operated on a New Jersey road exceeded 80,000 pounds, a fact not necessarily required for proof of a registration violation under Section 20e.

When evaluating double-jeopardy claims in the context of multiple prosecution, however, we must consider not only whether the elements of the offense are the same, but whether the same evidence proves those elements. *Vitale, supra,* 447 *U.S.* at 419–20, 100 *S.Ct.* at 2266–67, 65 *L.Ed.*2d at 237–38; *State v. DeLuca,* 108 *N.J.* 98, 107–08 (1987). Although *DeLuca* involved multiple prosecutions, not multiple punishment, we believe the same rule should apply in determining whether two offenses are the same for both double-jeopardy purposes.

Turning to the offenses before us, when a vehicle is registered under Section 20 at the statutory maximum of 80,000 pounds, proof of an offense under Section 84b(4) requires no proof beyond that required for an offense under Section 20. Proof that an owner registered his vehicle at 80,000 pounds and operated it above this registered weight establishes a violation of Section 20e. Furthermore, the same proof necessarily establishes a violation of Section 84b(4), which bars operation of a vehicle that weighs more than 80,000 pounds. Proof of a Section 20e violation proves the Section 84b(4) offense. Thus, the two offenses are the same. In the absence of a clear

legislative intent to the contrary, cumulative punishment for both offenses would violate the double-jeopardy clause of the United States Constitution.

If, however, the New Jersey Legislature had stated clearly that an operator who violates both Sections 20 and 84 could be punished cumulatively, imposition of multiple fines would not violate federal double-jeopardy principles. Because we have concluded both as a matter of legislative intent and federal double-jeopardy analysis that multiple penalties may not be imposed, we do not reach the question whether article 1, paragraph 11 of the New Jersey Constitution would preclude imposition of those penalties if the Legislature had so intended.

In the past, we have interpreted the double-jeopardy clause under the State Constitution as co-extensive with the federal clause. *See, e.g., DeLuca, supra,* 108 *N.J.* at 101–02; *Dively, supra,* 92 *N.J.* at 580. That interpretation evolved, however, in the context of multiple prosecutions, not multiple penalties. At some point we may be obliged to reconcile the statement in *Hunter* that multiple punishment may be imposed if the Legislature clearly so intends with a conflicting proposition from our own cases. The conflicting proposition is that the Legislature would exceed its authority if in creating two offenses it simply applied different labels to the same offense. *See State v. Davis,* 68 *N.J.* 69, 80 (1975). To date, we have not specified whether that proposition emanates from double jeopardy, substantive due process, or some other legal principle. *State v. Truglia,* 97 *N.J.* 513, 522 (1984); *State v. Best,* 70 *N.J.* 56, 59 (1976).

We have eschewed relying solely on legislative intent in favor of a more flexible approach to multiple punishment, one that entails

analysis of the evidence in terms of, among other things, the time and place of each purported violation; whether the proof submitted as to one count of the indictment would be a necessary ingredient to a conviction under another count; whether one act was an integral part of a larger scheme or episode; the intent of the accused; and the consequences of the criminal standards transgressed.

Certainly there are other factors to be considered and, along with the above, accorded greater or lesser weight depending on the circumstances of the particular case. [*Davis, supra,* 68 *N.J.* at 81.]

In other contexts, we have interpreted the State Constitution to accord greater protection than that provided by the federal constitution. *See, e.g., State v. Novembrino,* 105 *N.J.* 95 (1987) (interpreting State Constitution to bar federal good-faith exception to the exclusionary rule); *State v. Alston,* 88 *N.J.* 211 (1981) (retaining traditional rule that defendant has standing to suppress illegally-seized evidence in which defendant has a proprietary, possessory, or participatory interest). Because we are deciding the present matter on the basis of statutory construction, we need not decide whether multiple punishments that may be imposed without violating the federal double-jeopardy clause would nonetheless violate the double-jeopardy clause or substantive due-process principles of the State Constitution.

In his concurring opinion, Justice Handler reaches for the potential conflict between *Hunter's* reliance on legislative intent and the more flexible approach of *Davis* and *Best. Post* at 122–123. Having reached for the conflict, he tilts away from *Hunter* and towards the more flexible approach. *Id.* at 123–124. Whatever merit inheres in that orientation is another issue for another day. As a matter of statutory construction, the lack of clarity in legislative intent suffices to resolve the issue of multiple punishment. *Supra* at 101–103. Furthermore, statutory interpretation and federal double-jeopardy law are so intertwined that reliance on legislative intent virtually compels consideration of the federal double-jeopardy implications of the decision, particularly when the parties have so extensively briefed and argued the issue. For some unexplainable reason, the concurrence fails to grasp the difference between resolution of that issue, which is before us, and resolution of the continuing symmetry between federal and state law of multiple punishment, which need not be reached in this proceeding.

Also in his concurring opinion, Justice Handler imputes to the Legislature the intent not to impose multiple punishment for a violation of both Sections 20 and 84. He contends that the statutory history of barring cumulative punishment is not countermanded by the 1983 amendments. The legislative history, however, can be read to intimate that the 1983 amendments to Section 20 were designed to establish a registration violation as a separate offense, one that was to be punished in addition to an excess-weight violation.

Section 20e contains the fines for registration violations, which since 1984 have been significantly higher than fines for excess-weight violations under Section 84.3j. The penalties under Section 20e were apparently designed to discourage trucks from carrying weight in excess of their registered weight "where the penalty is so low that it is worth it for truckers to carry the extra weight and pay the penalty." *Public Hearing, supra,* at 51 (testimony of Commissioner Sheridan). Commissioner Sheridan's testimony, quoted above more extensively, indicates that the enhanced penalties under Section 20e were designed to insure that New Jersey trucks, which conceivably use New Jersey roadways more than foreign-registered trucks, pay their fair share of the damage to New Jersey roadways. Absent an appropriate fine under Section 20, the Commissioner believed that operators would not be discouraged from operating vehicles in excess of registered weight and from damaging the New Jersey roadways.

Imposition of penalties under both Section 84 and the more recent Section 20e could be viewed as part of a comprehensive legislative plan to levy fines that are sufficiently high to deter operation of vehicles in excess of registered and gross weight and to recoup the cost of repairing damaged highways. Arguably, the legislative purpose would be furthered by the imposition of cumulative fines for registration- and gross-weight violations. Otherwise, the argument proceeds, the Legislature would not have isolated fines for registration violations in Section 20e and then increased those fines one year later. That

interpretation, although not a sufficiently clear expression of legislative intent to support the imposition of cumulative penalties, contradicts the view of the concurrence that the amendments preclude cumulative punishment. In brief, imputing a legislative intent not to impose multiple punishment distorts the legislative history. We believe that a fair reading of the legislative history requires us to resort to the principle that penal statutes should be construed strictly against the State when the Legislature's intent is unclear.

–IV–

■ Defendants further contend that applying Section 20 to penalize weight violations above the maximum registration contravenes the due-process clauses of the fourteenth amendment of the federal Constitution and article 1, paragraph 1 of the New Jersey Constitution. In making that argument, they rely on principles of substantive due process, which require that a statute be rationally related to a legitimate legislative purpose and not be arbitrary and capricious. *Greenberg v. Kimmelman*, 99 *N.J.* 552 (1985). They emphasize that Section 20 is primarily a revenue-raising statute and that use of that section to penalize weight violations above the maximum registration is not a rational use of legislative power. As explained earlier, *supra*, at 98, Section 20 serves the further purpose of protecting the State's road system from and of recouping compensation for damage. Consequently, we hold that the penalty provisions of Section 20 are rationally related not only to raising revenue but also to deterring damage to the State's road system.

■ Finally, defendants contend that the New Jersey Transportation Trust Fund Authority Act of 1984 (the Act), *L.* 1984, *c.* 73, is an "appropriations" bill and that the inclusion in the Act of the amendment to Section 20e, which raised penalties for registration violations, contravenes the "one object" clause of

the New Jersey Constitution.[6] The Act is not an appropriation measure, but a mechanism for the raising of revenue to maintain the State's transportation system. Although diverse, the Act's provisions further its express purpose: the preservation of a sound, balanced transportation system through the provision of a stable source of funding. Its title indicates that the Act concerns financing the State's transportation system, creates and defines the functions and duties of the New Jersey Transportation Trust Fund Authority, and, among other things, "increases authorized * * * motor vehicle registration fees" and "the tax on diesel fuel * * *."[7] The title of a statute need only accurately label, not extensively index, the contents of the statute, and the title "should not be scrutinized in an overly technical manner." *Parking Auth. of Atlantic City v. Board*

---

[6]Article IV, section 7, paragraph 4, provides:
> To avoid improper influences which may result from intermixing in one and the same act such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title. This paragraph shall not invalidate any law adopting or enacting a compilation, consolidation, revision, or rearrangement of all or parts of the statutory law.

[7]The title to the Act reads as follows:
> An Act concerning financing for the State's transportation system, creating the New Jersey Transportation Trust Fund Authority and defining its functions, duties and powers, including the authorization to issue bonds, notes and other obligations, creating the Transportation Trust Fund Account within the General Fund, providing for the credit to the Transportation Trust Fund Account of $88 million and amounts equivalent to increases authorized in motor vehicle registration fees and in the tax on diesel fuel, providing for payment of funds of the New Jersey Transportation Trust Fund Authority to the Special Transportation Fund, and amending "The New Jersey Highway Authority Act," approved April 14, 1952 (P.L. 1952, c. 16), the "New Jersey Expressway Authority Act", approved February 19, 1962 (P.L. 1962, c. 10), and the "New Jersey Turnpike Authority Act of 1948", approved October 27, 1948 (P.L. 1948, c. 454) to provide authority for contractual payments by these toll road authorities to the State or the New Jersey Transportation Trust Fund Authority, amending various other parts of the statutory law and supplementing Title 27 of the Revised Statutes.

*of Chosen Freeholders,* 180 *N.J.Super.* 282, 299–300 (Law Div.1981) (citing *New Jersey Ass'n on Correction v. Lan,* 80 *N.J.* 199, 206 (1979)). We find that the title indicates the contents of the statute with sufficient accuracy to satisfy the mandates of the Constitution.

We affirm the judgment of the Appellate Division to the extent that it holds that an owner of a vehicle registered under Section 20 at the maximum weight may be found guilty of violating that section by operating in excess of that weight. We modify the judgment of the Appellate Division to the extent that it permits the imposition of cumulative punishment under both Sections 20 and 84. The judgment against OJO and Yardville is affirmed. The judgment of conviction against Churchdale and AC is affirmed, and the matter is remanded to the Law Division for the assessment of penalties consistent with this opinion.

HANDLER, J., concurring.

The Court concludes in this case that the State cannot impose cumulative or dual penalties for weight and registration violations when these respective violations are based on the same facts. While I do not disagree with the result reached by the Court, I reject the invocation of constitutional principles in deciding this issue. Statutory interpretation—either imputing to the legislature the intent not to impose dual penalties, or strict construction of these penal statutes—should suffice. The constitutionalization of this case is both unnecessary and unwise.

I.

The only issue, as I see it, is one of statutory interpretation. The Court takes evident pains to interpret and understand a rather complicated statutory scheme; its effort to determine the legislative intent concerning cumulative penalties is sedulous to a point. However, it breaks off its pursuit of legislative

intent, concluding that the Legislature's intent is "unclear" and then determining that under the principle of strict construction of penal statutes, multiple punishment for simultaneous weight and registration violations is inappropriate. The Court acknowledges the sufficiency of this principle as a basis for decision, but instead of clearly developing and relying on the applicability of this principle, the Court seems to incorporate into its analysis federal double-jeopardy principles intended to demonstrate independently that dual penalties cannot be imposed in this case. In my view, confronted with "unclear" legislative intent, the Court could not sanction the imposition of dual penalties regardless of double-jeopardy considerations. Rather than plunging into the abyss of double-jeopardy jurisprudence, the Court could have rested its conclusion solely on strict construction, or even could have concluded that there is a sufficient basis to determine by reasonable imputation that the Legislature itself did not intend multiple punishments for registration and weight violations based on identical facts.

What is at issue here is whether under this statutory scheme the Legislature intended the imposition of multiple or cumulative punishment for the commission of separate regulatory crimes that are based on the same facts. If we were to conclude that dual penalties were intended by the Legislature, then we might have some concern with the *validity* of such dual punishment. In that posture, the case might have double-jeopardy implications. See discussion, *infra* at 117–124. Such double-jeopardy overtones, however, do not excuse the need to engage in statutory construction. Indeed, they demand it.

Our Court has long recognized the extent to which constitutional principles can overlap common-law doctrine, particularly in situations that appear to implicate double-jeopardy concerns. *E.g., State v. Labato,* 7 *N.J.* 137, 144 (1951) ("constitutional guaranties against double jeopardy are merely declaratory of the common law.") Nevertheless, the Court need not confront the question whether statutory meaning can be answered

through constitutional analysis; indeed, the Court in this case explicitly states that the decision need not be predicated on double-jeopardy analysis since statutory construction indicates that defendants may not be punished under both Section 20e and Section 84(b)(4). *See ante* at 101. This acknowledgement of the superfluity of constitutional analysis calls into question the necessity or wisdom of engaging in unwarranted discussion of double-jeopardy principles.

The Court correctly identifies strict construction of penal statutes as a basis for decision in this case, but does so in a cursory manner that belies the soundness and sufficiency of this principle as an adequate basis for decision. *See ante* at 102. Our decisional law clearly importunes us to construe such statutes strictly and narrowly. *See, e.g., State v. Valentin*, 105 *N.J.* 14 (1987). If there is genuine doubt about the statute's meaning, that doubt should be resolved against an expansive application of its penal sanctions. *See, e.g., State v. Valentin, supra*, 105 *N.J.* at 18; *State v. Provenzano*, 34 *N.J.* 318 (1961). This applies to penal statutes that address regulatory concerns. *See, e.g., State v. Dixon*, 114 *N.J.* 111 (1989); *State v. Fair Lawn Serv. Center, Inc.*, 20 *N.J.* 468, 472 (1956). The rule of strict construction serves to confine both the scope of offensive conduct covered and "the penalty applicable to such conduct." *State v. Maguire*, 84 *N.J.* 508, 514 n. 6 (1980). Whether a penal statute imposes by clear terms multiple or cumulative punishments for offenses based on identical facts poses an interpretive issue that calls for circumspect and strict analysis. Only in unusual circumstances, such as where an obvious legislative intent is unmistakably confirmed by a strong public policy, can an expansive application of a criminal statute's penal sanctions be tolerated. *See, e.g., State v. Tischio*, 107 *N.J.* 504 (1987); *State v. Des Marets*, 92 *N.J.* 62 (1983). Conversely, if there is a sufficient doubt about the constitutional validity of a particular statutory application, a legislative intent should be imputed that will remove the doubt. *See, e.g., Matter of Kimber Petroleum Corp.*, 110 *N.J.* 69, 83 (1988).

Here, it should suffice to point out that regulation through penal statutes of the operation of commercial motor vehicles with respect to their size and weight does not invoke a compelling public policy sufficient to impel us to infer a need for multiple or enhanced punishments when these are not otherwise plainly and clearly provided.

Strict construction does not provide the only tool of statutory interpretation available for decision of this case; the Court could easily conclude that there is a sufficient basis to determine by reasonable imputation that the Legislature did not intend multiple punishments for registration and weight violations based on identical facts.

The basis for this conclusion can be found in the Court's own opinion. The Court correctly rejects the State's argument that the 1983 amendment of *N.J.S.A.* 39:3–20 and 3–84 bespeaks clear legislative intent to establish separate and independent penalties for simultaneous weight and registration violations. As the Court ably demonstrates, there is no clear indication of legislative intent that this should be so. Since the Court concludes that the legislative intent with respect to dual penalties is "unclear," and simply refuses to impute any intent one way or the other, it is arguable that with respect to a second penalty the statute is incomplete, and therefore unenforceable. *See, e.g., State v. Fair Lawn Serv. Center, supra,* 20 *N.J.* at 473 ("Where a statute fails to provide a penalty it has been uniformly held that it is beyond the power of the court to prescribe a penalty."). However, in light of the statute's facial ambiguity and historical antecedents, as well as the penal nature of the regulatory scheme, I would determine that it is reasonable to impute to the Legislature the intent *not* to impose multiple or cumulative punishments in these circumstances.

We should consider the historical antecedents of the statute for indications of what legislative intent can reasonably be imputed. *State v. Madden,* 61 *N.J.* 377 (1972). *N.J.S.A.* 39:3–84.3k (previously *N.J.S.A.* 39:3–84) now provides only for single

fines in the context of simultaneous weight violations. There is, however, no indication by the Legislature demonstrating intent to levy registration penalties consecutive to weight penalties based on the same set of facts. Indeed, as recognized by the Court, from 1966 to 1983, section 84, most particularly *N.J.S.A.* 39:3–84.3, "explicitly prohibited cumulative punishment" for simultaneous weight and registration violations. *Ante* at 101. Further, when the Legislature amended section 20, it retained the provision that "this section shall not be construed to supersede or repeal the provisions of section [84]." *N.J.S.A.* 39:3–20e. This historical prohibition implies a legislative intent contrary to that argued by the State. Because, in determining legislative intent, this Court "must consider any history which may be of aid," *State v. Madden, supra,* 61 *N.J.* at 389 this prohibition of multiple punishment should not be undervalued.

I find no barrier to the imputation of a legislative intent to require an election of regulatory remedies, rather than to mandate or permit the imposition of dual penalties. No regulatory objective of the statutory scheme will be disserved or undermined by such an interpretation. The prosecutor will be free to pursue and the court will be empowered to impose that sanction, be it the most or least severe, prescribed by the Legislature for the commission of either offense when proof of identical facts indicate that both offenses have occurred.

It is thus clear as a matter of sound statutory construction that the imposition of multiple penalties for simultaneous registration and weight violations is entirely inappropriate. We are provided with neither a clear statutory mandate nor an unambiguous manifestation of legislative intent nor a compelling public policy that severally or collectively justify the imposition of multiple punishment. Further, we are cautioned by our traditional understanding of regulatory penal statutes to construe their terms narrowly and strictly. We see, moreover, a statutory history, not countermanded by current enactment, forcibly indicating a continuing legislative intent that multiple

punishments not be imposed. These factors demonstrate that principles of statutory construction—either imputation of legislative intent or strict construction of penal statutes—provide a sufficient basis for decision of this case.

## II.

The Court, nevertheless, reaches out to convert a rather straight-forward issue of statutory construction into one of constitutional dimensions. In doing so, the Court seemingly acknowledges an understanding that the double-jeopardy protections afforded by our State Constitution may not be co-extensive with those provided by the federal clause, and professes to defer consideration of our own Constitution for another day. *Ante* at 106–108. By opting, however, to marshal double-jeopardy analysis to determine or confirm a statutory meaning, the Court may be treading further down the path of constitutional doctrine than it believes.

Neither invocation nor expansion of constitutional double-jeopardy analysis is required in this case. Indeed, it is ironic that in resorting to double-jeopardy analysis, the Court cites case law demonstrating that double-jeopardy principles do *not* control the decision of the main issue contested in this case— what the *statute* means. *See, e.g., Ohio v. Johnson*, 467 *U.S.* 493, 104 *S.Ct.* 2536, 81 *L.Ed.*2d 425, *reh'g* denied, 468 *U.S.* 1224, 105 *S.Ct.* 20, 82 *L.Ed.*2d 915 (1984); *Missouri v. Hunter*, 459 *U.S.* 359, 103 *S.Ct.* 673, 74 *L.Ed.*2d 535 (1983). These cases clearly indicate that legislatures determine whether multiple punishments apply to single specific instances of conduct.

The United States Supreme Court has recognized that the traditional judicial role of effectuating legislative intent is a function different from the application of double-jeopardy strictures in determining a statutory result. In *Whalen v. United States*, 445 *U.S.* 684, 100 *S.Ct.* 1432, 63 *L.Ed.*2d 715 (1980), the Court stated that "the question whether punishments imposed by a court after a defendant's conviction on criminal charges

are unconstitutionally multiple cannot be resolved without determining what punishments the Legislative Branch has authorized." *Id.* at 445 *U.S.* at 688, 100 *S.Ct.* at 1436, 63 *L.Ed.*2d at 721. In three separate opinions variously concurring or dissenting from the *Whalen* majority, Chief Justice Burger and Justices White, Blackmun, and Rhenquist expressed their belief that resolution of this question centered on statutory construction rather than application of the Double Jeopardy Clause. *See, e.g., id.* at 696, 100 *S.Ct.* at 1440, 63 *L.Ed.*2d at 726 (White, J., concurring). Justice Blackmun stated that

> [d]icta in recent opinions of this Court at least have suggested, and now I think wrongly, that the Double Jeopardy Clause may prevent the imposition of cumulative punishments in situations in which the Legislative Branch *clearly intended* that multiple penalties be imposed for a single criminal transaction. I believe that the Court should take the opportunity presented by this case to repudiate those dicta squarely, and to hold clearly that the question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed. I must concede that the dicta that seemingly support a contrary view have caused confusion among state courts that have attempted to decipher our pronouncements concerning the Double Jeopardy Clause's role in the area of multiple punishments. [*Id.* at 697–98, 100 *S.Ct.* at 1440–41, 63 *L.Ed.*2d at 727–28 (Blackmun, J., concurring) (citations and footnotes omitted).]

Justice Blackmun's invitation to clarify the relationship between statutory interpretation and the double jeopardy clause was accepted the following term, when the Court stated that "the question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed." *Albernaz v. United States,* 450 *U.S.* 333, 344, 101 *S.Ct.* 1137, 1145, 67 *L.Ed.*2d 275, 285 (1981). This observation, understood in the context of the judicial dialogue presented in *Whalen,* clearly demonstrates the superfluity of double-jeopardy principles in pursuing what is, in essence, an exercise in statutory construction. Indeed, other jurisdictions have recognized the limited role of the Double Jeopardy Clause in analogous situations. *See, e.g., State v. Gardner,* 315 *N.C.* 444, 460, 340 *S.E.*2d 701 (1986) (Double Jeopardy Clause plays limited role; legislative intent is determinative); *People v. Robideau,* 419 *Mich.* 458,

355 *N.W.*2d 592 (1984) (only interest of defendant is not having more punishment imposed than intended by legislature; legislative intent is determinative).

Concededly, it is difficult to stay clear conceptually from double-jeopardy principles. As the Court notes, citing *North Carolina v. Pearce*, 395 *U.S.* 711, 717, 89 *S.Ct.* 2072, 2076, 23 *L.Ed.*2d 656, 664–65 (1969), the Supreme Court has interpreted the Double Jeopardy Clause of the United States Constitution to provide three forms of constitutional protection: protection against second prosecution for the same offense after either acquittal or conviction, and protection against multiple punishments for the same offense. *Ante* at 103. Since this case presents a multiple-punishment problem, the attraction of double-jeopardy anaylsis is present. However, it cannot be overemphasized that multiple-punishment cases and successive-prosecution cases involve different interests, and that multiple-punishment issues may *not* actually invoke the same double-jeopardy protections that are applied in multiple-prosecution cases:

> Successive-prosecution cases involve the core values of the Double Jeopardy Clause, the common-law concepts of *autrefois acquit* and *convict*. Where successive prosecutions are involved, the Double Jeopardy Clause protects the individual's interest in not having to twice "run the gauntlet", in not being subject to "embarrassment, expense and ordeal", and in not being compelled "to live in a continuing state of anxiety and insecurity", with enhancement of the "possibility that even though innocent he may be found guilty".
>
> \*       \*       \*       \*       \*       \*       \*       \*
>
> Different interests are involved when the issue is purely one of multiple punishments, without the complications of a successive prosecution. The right to be free from vexatious proceedings simply is not present. The only interest of the defendant is in not having more punishment imposed than that intended by the Legislature. [*People v. Robideau, supra*, 419 *Mich.* at 484–85, 355 *N.W.*2d at 602–03 (citations omitted).]

This difference in interests is amply reflected by the numerous pronouncements by federal and state courts that legislative intent, rather than double-jeopardy principles, controls the decision of multiple-punishment issues. Professor Thomas explains this in "Multiple Punishments For the Same Offense: The Analysis After *Missouri v. Hunter* or *Don Quixote, The Sar-*

*gasso Sea, and The Gordian Knot,"* 62 *Wash.U.L.Q.* 79 (1984) (hereafter "Multiple Punishments"). He points out that under *Missouri v. Hunter, supra,* 459 *U.S.* 359, 103 *S.Ct.* 673, 74 *L.Ed.*2d 535, multiple-punishment doctrine is distinctive. It is derivative in nature and is not a protection that is directly provided or defined by the Double Jeopardy Clause, which in other contexts serves to constrain legislative as well as other state actions; rather, the multiple-punishment doctrine may be more properly regarded as a stricture against the judiciary from invading the legislative province. *Id.* at 124.

Because the Court accepts the teachings of *Hunter,* its opinion is not exceptional in acknowledging that double-jeopardy principles should not control the determination of legislative intent. But there is another problem: whether double-jeopardy principles should be available as a source of substantive protection against multiple-punishment for the same offense.

The Supreme Court itself was sharply divided on the issue of the extent to which legislative intent to impose multiple punishment might be the sole determinant of the appropriateness of such punishment. Professor Thomas noted, for example, that Justice Stewart, who authored the majority opinion in *Whalen,* forcefully challenged the Court's subsequent treatment of *Whalen.* In his concurring opinion in *Albernaz,* in which he was joined by Justice Marshall and Stevens, Justice Stewart said: "[N]o matter how clearly it spoke, Congress could not constitutionally provide for cumulative punishments unless each statutory offense required proof of a fact that the other did not, under the criterion of *Blockburger v. United States.*" Thomas, "Multiple Punishments," *supra,* 62 *Wash.U.L.Q.* at 104 (quoting *Albernaz v. United States, supra,* 450 *U.S.* at 345, 101 *S.Ct.* at 1145–46, 67 *L.Ed.*2d at 286 (Stewart, J., concurring)). This leads to an aspect of statutory interpretation that has engendered serious difficulties in the realm of double-jeopardy analysis: determination of what substantive standards define whether offenses are the "same" and what relevance

these standards have to multiple punishments as well as to multiple prosecutions.

Professor Thomas has pointed out that embedded in the *Hunter* decision is its assumption that the "sameness" of underlying offenses is not of critical importance when it comes to multiple punishments. There are, however, two schools of thought, *viz:*

> The conflict between the dissent and the majority opinion in *Hunter* mirrors the conflict between the Missouri Supreme Court and a majority of the United States Supreme Court. One view is that punishments imposed in a single proceeding can never be multiple if the legislature has authorized them, and thus clearly authorized multiple penalties cannot be multiple punishment for the same offense. The other view is that the double jeopardy clause will not permit the legislature to authorize more than a single conviction for the same offense.

> Under the view of the dissent in *Hunter,* only one type of same offense analysis is necessary because the analysis is the same whether it arises in the context of a single proceeding or of successive prosecutions. Under the view of the *Hunter* majority, a different type of analysis must be applied in multiple punishment cases. [Thomas, "Multiple Punishments," *supra,* 62 *Wash.U.L.Q.* at 112.]

The question of the "sameness" of offenses has proven problematic. Our own decisional law demonstrates the numerous and difficult problems involved in determining the "same offense" in this as well as in other contexts implicating federal double-jeopardy concerns. *Compare State v. DeLuca,* 108 *N.J.* 98 (1987) (same-elements and same-evidence tests of double jeopardy are alternatives) *with State v. Dively,* 92 *N.J.* 573 (1983) (same-elements and same-evidence tests of double jeopardy are cumulative). The difficulty of this technical question is compounded by the realization that "sameness" may have differing ramifications in multiple-conviction and multiple-punishment contexts, thus engendering different measures of similarity in each context. This complexity suggests that even aside from the difficulties inherent in any consideration of the relationship of double-jeopardy principles under the Federal and State Constitutions, any effort to further our understanding of relevant federal principles should be undertaken only when

circumstances demand such analysis; otherwise, already murky waters are much too easily roiled.

The effects of such casual constitutionalization are apparent in this case. In analyzing and accepting the *Hunter* doctrine, the Court, in effect, homogenizes the multiple-prosecution and multiple-punishment contexts; it applies the standard for "sameness" governing multiple prosecutions to multiple punishments. *Ante* at 106. While this result may not be incorrect, it should not be unnecessarily embraced without the fullest possible consideration of the consequent implications for our understanding of federal double-jeopardy doctrine. This cautionary note is even more appropriate in a case, like this one, where the sufficiency of statutory interpretation as a basis for decision obviates any need to engage in constitutional analysis in the first place.

By restricting its discussion of double-jeopardy considerations to analysis and interpretation of federal double-jeopardy principles, the Court seeks to avoid deciding whether multiple punishments that may be imposed without violating the federal Double Jeopardy Clause might nonetheless violate the Double Jeopardy Clause or substantive due process principles of the State Constitution. There is, however, a potential or inchoate conflict between the doctrine expressed by the Supreme Court in *Hunter* and our own decisional law.

The Court is well aware of the extent to which *Hunter* and our own case law conflict with regard to whether legislative intent is the determinative factor in ascertaining the permissible limits of multiple punishments. The Court, as already noted, recognizes that "the [federal] constitutional protection [as construed in *Hunter*] against double jeopardy does not prohibit multiple punishment of two statutory offenses involving essentially the same conduct tried in a single trial when there is a clear expression of legislative intent to impose punishment for those offenses." *Ante* at 105. However, such deference to legislative intent has not been a feature of our

own double-jeopardy doctrine. In *State v. Davis*, 68 *N.J.* 69
(1975), we stated that "[w]ere the legislature, in attempting to
create separate crimes, to do no more than simply apply differ-
ent labels to what is in fact the same charge, it would plainly
exceed its authority." *Id.* at 80. This proposition, expressive
of a more restrictive view of legislative power to impose multi-
ple punishments than that permitted under the more expansive
*Hunter* double-jeopardy principles deployed by the Supreme
Court, cannot comfortably co-exist with the *Hunter* doctrine.

Our understanding of state constitutional protections also
conflicts with federal double-jeopardy principles in other ways.
For example, we have formulated a flexible approach toward
determination of when separate offenses have been established,
acknowledging the applicability of "considerations of 'fairness
and fulfillment of reasonable expectations in the light of consti-
tutional and common law goals.'" *State v. Davis, supra*, 68
*N.J.* at 81 (quoting *State v. Currie*, 41 *N.J.* 531, 539 (1964)).
These considerations are particularly relevant in the context of
multiple punishments. We have not depended exclusively on
"principles of double jeopardy, substantive due process or some
other legal tenet" in addressing multiple punishment issues.
*State v. Best*, 70 *N.J.* 56, 61 (1976).

Although the Court maintains that the conflicts embodied by
these competing principles are not implicated through invoca-
tion of federal doctrine alone, the Court should nonetheless
appreciate the extent to which its interpretation and tolerance
of the *Hunter* doctrine might suggest an affinity toward the
federal view of double jeopardy. The attraction to *Hunter* can
imply the adoption of its assumptions about what substantive
standards define whether offenses are the "same" and what
relevance those standards have to multiple punishments as well
as multiple prosecutions. The Court can ill-afford to accept
implicitly the view that for state constitutional purposes the
double jeopardy clause segregates multiple punishments from
multiple prosecutions, or the view that whether offenses are

the "same" may be constitutionally more significant for purposes of multiple convictions than for multiple punishment.

The Court claims to have preserved its state constitutional options. Nevertheless, one must consider whether unnecessary constitutionalization of this case has cast a shadow on future state constitutional understanding of some very perplexing problems. The protections of double jeopardy are extremely chimerical in the context of dual punishment because they can be, under *Hunter*, satisfied simply by viewing double jeopardy merely as a mirror image of the legislature's intent. Were the Court later to conclude in a case that there is something fundamentally wrong about multiple punishments, the Court would have either to repudiate *Hunter* or, alternatively, to look beyond double jeopardy and invoke fundamental fairness, "substantive due process or some other legal tenet." *State v. Best, supra,* 70 *N.J.* at 61. By reaching out to buttress its decision in this case with double-jeopardy principles, the Court may be signalling a predisposition to increase the weight of double jeopardy relative to other underlying tenets. The substantive effect of such a valuation in analyzing state constitutional doctrine could be considerable if accompanied by an embrace of the *Hunter* doctrine, with its relatively high deference to statutory intent and concomitant notion that double jeopardy does not restrain legislative action.

### III.

In determining whether separate convictions for possession and distribution of narcotics involved the "same" offense, *Davis* now seems prescient in its observation that expansion of the double jeopardy clauses "beyond their traditional scope ... need not be pursued ... inasmuch as the members of the Court who vote with [the majority] ... are not of one mind on the question of whether it is double jeopardy or substantive due process that is to be applied." *Id.* 68 *N.J.* at 76. In its rush to interpret and apply *Hunter* in this case, the Court, whether it

thinks so or not, goes far toward committing itself to the proposition that the definition of "same" offense for multiple-punishment purposes can be different from its definition for other double-jeopardy purposes.

It is possible that we may be compelled to repudiate the assumptions rather gratuitously reached in this case. Therefore, why become involved in this doctrinal imbroglio? I return to an initial point: this case involves only a question of statutory interpretation, and not a very exceptional one at that. We should in such a case adhere to the sage advice of Chief Justice Weintraub:

[t]he Constitution must not be busied with issues that are *minutiae* in a grand scheme of things; it serves best as a majestic presence, unperturbed by claims of absolute verity in matters economic, social, moral, spiritual, medical or penological. It is very human, and very wrong, to see one's image in every nook of the Constitution. There must be tolerance of disagreement, for without it there can be no experimentation or ready accommodation to a changing scheme. Of greater importance, the judiciary must not lose popular acceptance as the final arbiter of the Constitution in historic disputes. This unique mystic value could be lost if the Constitution, construed to be weighted down with matters of legislative calibre, could command no higher regard. [*State v. De Stasio*, 49 *N.J.* 247, 261 (1967).]

We are not involved in an historic dispute. Where the question of legislative intent is no different from the question of constitutionality, the "legislative calibre" of the matter commends the wisdom of resort only to canons of statutory construction. We should hold the constitution in reserve and follow decisional principles other than double jeopardy analysis in determining the statutory issue presented.

The Court, in a case in which it is wholly unwarranted, may be stepping into doctrinal quicksand. I can therefore concur only in its judgment.

HANDLER, J., concurs in the result.

*For affirmance and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.